2023 IL App (1st) 210754

SIXTH DIVISION
Filing Date June 23, 2023

No. 1-21-0754

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 13 CR 02582 |
| YECARY HARRIS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor concurred part and dissented in part, with opinion.

**OPINION**

¶ 1     Following a bench trial, defendant Yecary Harris was convicted of first degree murder and sentenced to a 50-year prison term. On appeal, defendant raises the following constitutional issues: (1) his trial counsel was ineffective for failing to call an expert on eyewitness testimony and failed to disclose a potential conflict of interest, (2) he received an insufficient *Krankel* hearing where the trial court did not allow defendant to present rebuttal evidence (see *People v. Krankel*, 102 Ill. 2d 181 (1984)), and (3) the trial court failed to get defendant's waiver for

in-person hearings before holding his motion for new trial and sentencing hearings on Zoom without counsel being in the same location as defendant. For the reasons that follow, we affirm defendant's conviction and remand for a new sentencing hearing.

¶ 2                                    I. BACKGROUND

¶ 3                                   A. Trial Proceedings

¶ 4        Defendant's conviction stems from the shooting death of Christopher Thomas (the victim) on December 30, 2012. He was initially charged with six counts of first degree murder and two counts of aggravated fleeing or attempt to elude a peace officer. Codefendant Rodney Harris[1] was charged with two counts of aggravated fleeing or attempt to elude a peace officer. Defendant proceeded to a bench trial in 2016.

¶ 5        During opening statements, defendant's trial counsel, Steven Murphy, argued that the evidence would show that defendant acted "reasonably and justifiably." Attorney Murphy stated that defendant was unarmed, intended to purchase marijuana from the victim, and during negotiations, showed the victim $780. The victim lunged at defendant, and defendant ran to the gas station where codefendant Harris was located because he thought that he was going to be beaten and robbed by the victim. Murphy further argued that codefendant Harris took off, there was a chase, and an accident occurred, before the car flipped.

¶ 6        The State presented the testimony of three witnesses at trial.

¶ 7        Albert Williams testified that on December 30, 2012, at approximately 5 p.m., he was working at Hyde Park Liquors located at 51st Street and Indiana Avenue in Chicago. James Banks was also working that day, and they were unloading deliveries. Williams testified that

_____

[1]Defendant and codefendant Harris share a surname but are not related to one another.

"certain people" would come and "hang out" at the store. The victim was at the store that day, talking to Williams and Banks. Williams saw defendant enter the store and begin talking to the victim. Williams described defendant as wearing a blue short-sleeve shirt and blue jeans. Defendant asked Williams where he could buy cigarettes and marijuana and Williams told him he could get those items from Banks, who was selling drugs inside of the liquor store. Defendant told the victim that he did not want to buy marijuana inside the store because of the cameras, and they subsequently left the store together and walked down the street.[2] During trial, Williams narrated video surveillance footage from inside the store and identified everyone in the video, which showed defendant and the victim leave the store together.

¶ 8        Shortly thereafter, Williams left the store to pick up food from the restaurant next door, which was across the street from a Citgo gas station. While standing outside of the restaurant, he saw defendant and the victim talking on the other side of the restaurant, approximately 20 feet away. Although it was dark outside, Williams clearly saw defendant and the victim, as nothing blocked his view. Williams saw the victim remove his maroon leather coat, and then defendant shot the victim. Williams testified that the victim's coat had a bullet hole in it because the victim never fully removed it. Instead of running, the victim tried to grab defendant's gun, and Williams stated that was how defendant shot him through the coat. The victim fell down, and defendant shot him again. Williams got on the ground because defendant was just "shooting around." Williams heard about six or seven additional shots. Williams did not see the victim with a weapon and did not see any physical altercation between the victim and defendant. After the shooting, defendant jumped over Williams and ran to the corner.

_____

[2]The record is not clear why defendant spoke to the victim instead of Banks as directed by Williams.

Defendant put the gun in his waistband, crossed the street, and entered the passenger side of a silver car in the Citgo parking lot. People were screaming that "he shot Mad Dog."[3] The police arrived within one minute and went to the gas station. Meanwhile, Williams saw the silver car head east on 51st Street. Later that night, Williams identified defendant in a lineup as the shooter.

¶ 9 Donald Braxton testified that, on the day of the shooting, he was at 51st Street and Indiana Avenue at around 5 p.m. It was still light outside but was getting dark. He was walking towards the restaurant when he heard five or six shots and saw a man shoot another man. Braxton stated that he saw the shooter's face and identified defendant in court as the man who shot the victim. While Braxton had never seen defendant before, he had known the victim for at least 10 years. After being shot, the victim fell to the ground, and defendant ran across the street and got into a car. Braxton stated that he continued watching defendant because he had a gun and he saw defendant stuff the gun in the back of his waistband. When the police arrived, Braxton told them that defendant got into a car. Braxton further testified that there were no weapons on the ground near the victim and the victim did not have anything. Additionally, Braxton went over to the victim, as the victim "took his last breath." Braxton subsequently went to the police station, told detectives what happened, viewed a lineup, and identified defendant, who he indicated had "d[one] a murder just gunned down somebody in cold blood."

¶ 10 Braxton acknowledged his retail theft conviction from 2013, his theft conviction from 2010, and his heroin use. Braxton also had tattoos indicating that he was formerly a member

---

[3]The victim was known as Mad Dog in the neighborhood.

of the Gangster Disciples. He stated that the victim was not a Gangster Disciple and had never "gangbanged."

¶ 11       Anthony Freeman testified that he was on his way to the liquor store on December 30, 2012, when he saw two men talking nearby. He saw one of the men pull out a gun and shoot the other man at least two times. The victim fell on the ground, and the man shot him again. Freeman started "backtracking" and fell in the grass. Freeman did not see either man's face, and the victim's back was to Freeman. Freeman stated that it did not look like the men were fighting.

¶ 12       Chicago police officer James Atkinson testified that, at the time of the shooting, he was in uniform and in a marked squad car monitoring traffic approximately one block east of the liquor store. After hearing several gunshots in the area, he notified dispatch and drove towards the liquor store. When he arrived, Braxton pointed to a silver Chrysler at the gas station as the car where the shooter was. After activating his emergency lights, Atkinson went to the gas station and pulled behind the silver Chrysler, which had two people inside. Chicago police officer Bobby Tong also responded to the scene and tried to block the Chrysler. However, the driver of the silver Chrysler left the gas station and drove east on 51st Street. Atkinson, Tong, and subsequently Sergeant Jacob Alderden pursued the vehicle.

¶ 13       Atkinson testified that the silver Chrysler entered the Dan Ryan Expressway and the officers continued the high speed pursuit until the vehicle exited at 43rd Street. Atkinson was unable to exit at that location because he was going too fast. The silver Chrysler crashed into another vehicle, as its driver tried to exit the expressway. The Chrysler hit the other vehicle, causing the other car to flip over a couple of times before it landed in front of Atkinson's car on the expressway. After making sure that the civilians were okay following the crash,

Atkinson went up the embankment. He later learned that the driver of the Chrysler was codefendant. The State then published a video clip of the Citgo gas station from December 30, 2021, before and after the shots were fired.

¶ 14    On cross-examination, Atkinson denied that it appeared that defendant and the victim were struggling on the video.

¶ 15    Tong testified similarly to Atkinson. He was on patrol driving southbound on Prairie Avenue, when he heard five or six gunshots from the west. He drove towards the gunshots and was flagged down by Braxton. Tong spoke with Braxton and, based on that conversation, Tong drove towards Indiana Avenue, where he saw Atkinson behind a gray Chrysler sedan. After activating his emergency lights, Tong drove directly in front of the Chrysler. He stopped and exited his vehicle with his gun drawn; however, the driver of the Chrysler swerved around him and headed towards the Dan Ryan Expressway. Tong and Atkinson pursued the Chrysler and Tong never lost sight of the Chrysler during the chase. The Chrysler struck the rear of another vehicle on a ramp, which flipped down the embankment onto the expressway. Defendant exited the Chrysler and ran towards the fence line towards La Salle Street, which was up the exit ramp. Tong chased defendant up the ramp on foot towards La Salle. Tong arrested defendant approximately 60 to 90 seconds after the crash. The driver of the Chrysler was also detained.

¶ 16    The route of the police chase was from 51st Street to Prairie Avenue to 56th Street to Wabash Avenue to 63rd Street to Wentworth Avenue and onto the Dan Ryan Expressway. Tong later learned that a gun was recovered from the area of 5604 South Wabash Avenue, a location passed during the pursuit of the Chrysler.

¶ 17    Sergeant Alderden testified that he assisted in the pursuit of the Chrysler onto the expressway. The Chrysler went through stop signs without stopping, and the officers had to

weave in and out of traffic and exceed the speed limit to keep up with the Chrysler on the expressway. Alderden testified about the accident when the Chrysler attempted to exit at 43rd Street, after which he parked his vehicle on the express lanes and ran across the local lanes on foot. The driver of the Chrysler, codefendant, ran to the rear of the car, and the officers arrested him. Alderden saw someone run from the passenger side of the car, but he was unable to identify the person.

¶ 18    Chicago police officer Cornelius Downey testified that he was on patrol with Officer Terrence Morris at the time of the shooting, and they joined in the pursuit of the Chrysler at the base of the expressway at 47th Street. He saw the Chrysler have an accident at the 43rd Street exit, and both the driver and passenger exited the vehicle. Downey's police vehicle was equipped with a camera that captured his pursuit of the Chrysler, as well as defendant exiting the vehicle before fleeing. The dashcam video was published to the court.

¶ 19    Officer Morris testified substantially similar to Downey. Additionally, Morris testified that he chased defendant for a half block after defendant ran up the side of the expressway. Defendant then ran along the fence and climbed it. Morris ran alongside the fence until it ended, ran around it, and faced defendant. Tong then arrested defendant. Morris viewed dashcam video of defendant's pursuit, which was published to the court. Morris testified that the video showed the Chrysler speeding past his police vehicle, attempting to exit at 43rd Street, and striking another vehicle. It also showed defendant exiting the vehicle, according to Morris.

¶ 20    Officer Kevin Kilroy testified that he was on duty at the time of the shooting. When he arrived, he learned that the gun was not recovered, and he was given the path of the pursuit. Kilroy then retraced the route with other officers. When he drove past an apartment building at 5604 South Wabash, he found a 9-milimeter Luger in the parkway approximately an hour

after the shooting. Kilroy notified dispatch, secured the scene, and waited for the evidence technician.

¶ 21     Although the gun was recovered from a location along the pursuit route, none of the officers saw a gun thrown from the Chrysler.

¶ 22     Forensic Investigator Jamal Judeh testified that he arrived at the 5100 block of South Indiana Avenue at 5:45 p.m. to process a crime scene. He saw a deceased man lying on the sidewalk and he also recovered 10 fired cartridge cases, fired bullets, metal fragments, two cell phones, and narcotics from the scene. Two of the fired bullets and one metal fragment were recovered under the victim's body, which Judeh testified meant that someone stood over him and shot into his body. Only one of the victim's arms was inside his jacket, so it appeared he was removing his jacket when killed. Judeh then proceeded to 3959 South La Salle Street, where he saw two vehicles with extensive damage. He then went to 5604 South Wabash Avenue, where he recovered a two-tone Luger 9-milimeter semi-automatic handgun from the parkway. Judeh took swabs from the gun and sent them to the lab for analysis.

¶ 23     The parties entered several stipulations regarding the physical evidence.

¶ 24     They stipulated that Illinois State Police forensic scientist Debra Kebasha would testify that she received the swabs taken from the firearm. There was a mixture of at least three human DNA profiles on the swabs, but they were unsuitable for comparison.

¶ 25     They also stipulated that the casings and bullets from the crime scene were all fired from the recovered gun.

¶ 26     The parties also stipulated that Officer Steven Swain would testify that on December 30, 2012, he conducted gunshot residue testing on defendant and codefendant and sent the gunshot residue kit to the Illinois State Police Forensic Science Center for testing and analysis.

¶ 27      They further stipulated that Illinois State Police forensic scientist Ellen Chapman would testify that she received the gunshot residue kit administered to defendant and it was her opinion that defendant may not have discharged the firearm or that if he did discharge the firearm, the particles were removed by activity, were not deposited, or were undetected by the procedure.

¶ 28      The parties also stipulated that Dr. Stephen Cina would testify that he was the Assistant Cook County Medical Examiner who performed the victim's autopsy on December 31, 2012. Dr. Cina's examination revealed three gunshot entrance wounds to the left side of the victim's upper back, one gunshot entrance wound to his left midback, one entrance wound to his left arm, one entrance wound to his right midback, and two entrance wounds to his right arm. Dr. Cina concluded that the victim's cause of death was homicide due to multiple gunshot wounds.

¶ 29      After the State rested, defendant made an oral motion for a directed finding of not guilty. The trial court denied the motion.

¶ 30      The trial court admonished defendant regarding his right to testify, and defendant stated that he did not wish to testify. Defendant's counsel, attorney Murphy, rested without presenting any evidence on defendant's behalf.

¶ 31      During closing arguments, attorney Murphy stated again that they were seeking self-defense or second degree murder. Pointing to the videos, Murphy argued that the videos showed what looked like the victim making an aggressive move towards defendant, which was corroborated by his coat being half off.

¶ 32      The trial court found defendant guilty of first degree murder on March 3, 2016, indicating that it reviewed the videos and found nothing to indicate that defendant was justified in using deadly force in continuing shooting the victim after he was already lying on the ground. The

court further noted defendant's flight from the scene and the ensuing chase, which indicated consciousness of guilt. The trial court stated that it

"tr[ied] to be very careful with these matters and want[ed] to give all benefit of the doubt that [it could] to people on trial in all cases. Every case here is important when liberty is at stake. And [it] searched the record and *** looked carefully to again review the tape. [It] just [didn't] see anything that [the victim] did to indicate that somehow somebody would feel that they're justified in using deadly force. This looked more like just a cold-blooded homicide. Just an execution on the street. So, defendant is guilty as charged in the manner and form in the indictment."

¶ 33                                    B. Posttrial Proceedings

¶ 34        On the next court date, April 12, 2016, defendant refused to exit his cell. Defendant's trial counsel requested a behavioral clinical examination (BCX) for defendant to determine his fitness at the time of trial, for sentencing, and whether he was sane at the time of the offense. On June 1, 2016, the trial court received a letter that defendant did not participate in the BCX. Attorney Murphy stated that he spoke with defendant and that he would cooperate. The trial court told defendant that his counsel was exploring every avenue for him, and it was counsel's idea to order the BCX, which might help but that defendant needed to cooperate.

¶ 35        Dr. Melanie Venable wrote to the trial court on October 26, 2016, stating that she needed certain medical records to render an opinion on whether or not defendant was sane at the time of the offense, but that the DVD of defendant's arrest indicated no evidence of any psychiatric impairment at the time of the offense. In a letter dated May 10, 2017, Dr. Venable opined that defendant was legally sane at the time of the offense.

¶ 36  On June 18, 2017, defendant wrote a *pro se* motion to release attorney, in which he made several complaints regarding attorney Murphy's representation. Specifically, defendant complained that attorney Murphy (1) told him that the trial court would never believe that he did not shoot the victim and that his representation would be "all or nothing and reasonable doubt," (2) "convinced" defendant to enter the defense of self-defense just a few weeks prior to trial, (3) failed to contact and preserve favorable witnesses and obtain their statements, (4) prejudiced defendant by persuading him to perjure himself if he testified, (5) failed to seek and admit into evidence the 911 dispatch recordings, which gave a description of the shooters and the direction they fled, (6) failed to subpoena the phone records of an inmate, Ardamis Smith, who was told by the State's witness that if defendant did not give him $3000, defendant was never coming home, (7) failed to inform the State that defendant had a mental disorder for which he took medication prior to and during the time of the crime, as well as at trial, (8) failed to request a fitness evaluation to determine defendant's mental health prior to trial, and (9) persuaded defendant not to take the stand, denying him the ability to tell his side of the story.

¶ 37  Additionally, on July 11, 2017, defendant filed a *pro se* motion for new trial, in which he also raised the same allegations of ineffective assistance of trial counsel. The record further reflects that defendant sent a letter to the trial court dated September 12, 2017. In the letter, defendant further detailed his allegations of ineffective assistance of trial counsel, including counsel's failure to challenge the eyewitnesses' identification of defendant during the offense and at the lineup, as well as counsel's failure to challenge the results of the gunshot residue test.

¶ 38    On October 3, 2017, the trial court performed a preliminary inquiry into defendant's allegations. After questioning both defendant and attorney Murphy, the trial court appointed new counsel to investigate defendant's claims of attorney Murphy's ineffectiveness.

¶ 39    Defendant sent a second letter to the trial court sometime after October 3, 2017, in which he indicated that he asked attorney Murphy to secure an expert witness in eyewitness testimony, who could have testified about the factors affecting memory and perception of eyewitnesses.

¶ 40    On December 4, 2018, a *Krankel* evidentiary hearing began where defendant was represented by Assistant Public Defender (APD) Crystal Carbellos.

¶ 41    At the hearing, defendant testified that he was present when the victim was shot but he was not the shooter. He stated that attorney Murphy scared and coerced him into going along with a self-defense theory. Defendant stated that if he had testified at trial, he would not have admitted to shooting the victim, but he trusted attorney Murphy as his lawyer. Defendant also stated that attorney Murphy refused to interview and call various witnesses, including codefendant and Ardamis Sims. Codefendant would have testified that he was with defendant all day and he never saw defendant with a gun. Sims could have testified that Braxton attempted to extort money from defendant prior to trial by threatening to testify against him unless defendant paid him $3000. Defendant alleged that attorney Murphy should have also subpoenaed Sims's phone records because the jail conversations were recorded. Defendant also claimed that attorney Murphy refused to interview and call two women who called 911 after the shooting. The women described the shooters to 911 dispatchers as persons who did not fit defendant's clothing description. They also said that the shooters walked in a certain

direction after the shooting.[4] Finally, defendant testified that attorney Murphy refused to interview his doctors or to investigate his mental illness, his mental state at the time of the shooting, and the medications that he was taking. According to defendant, it would have been impossible for him to commit the offense because his medications made him like a "zombie." However, on further questioning, defendant stated he did not want attorney Murphy to investigate his state of mind at the time of the offense or to pursue that as a defense.

¶ 42       After defendant testified, the trial court continued the hearing for attorney Murphy to testify. Before the next court date, APD Carbellos passed away, and APD Dylan Barrett was appointed to represent defendant.

¶ 43       The *Krankel* hearing resumed on May 13, 2019. Attorney Murphy testified that he discussed arguing self-defense with defendant and stated that he did not coerce or scare defendant into pursuing that defense. Attorney Murphy explained that he chose the defense of self-defense because he saw videos of the shooting, videos of defendant being in the liquor store and walking around the corner where there was a video of the shooting, and videos of defendant running to his friend at the gas station right after the shooting. Additionally, the police were there immediately on the video and there was a chase also on video, which included his exit from the car and running away. Attorney Murphy was also aware that a gun was recovered.

¶ 44       Attorney Murphy testified that he did not hire a witness identification expert because there were videos and identification was never an issue. He did not recommend that defendant testify for strategic reasons and stated that defendant did not want to testify. Attorney Murphy

---

[4]The 911 audio recordings were not admitted into evidence at trial.

believed it was wise for defendant not to testify because he was in the videos and said that they had more than one conversation about what took place that day. However, on cross-examination he stated that he did suggest that defendant testify, but defendant did not want to.

¶ 45    With respect to interviewing codefendant, attorney Murphy did not interview him because codefendant was represented by attorney David Weiner, who attorney Murphy was representing on an unrelated case before the Attorney Registration and Disciplinary Commission (ARDC). He spoke with codefendant numerous times but not about what his testimony would be or the facts of the case.[5]

¶ 46    Attorney Murphy further stated that he was unaware of any conversation between Sims and Braxton or that Braxton wanted money. He did not make an effort to interview anyone who called 911 because he did not recall there being any 911 calls that helped defendant. Further, attorney Murphy was questioned about whether defendant ever told him that he was "off so much prescription medication, marijuana and alcohol he couldn't even hold a thought let alone shoot a man." In response, he invoked the attorney-client privilege. The trial court told attorney Murphy that at this point, the attorney-client privilege had been waived. Attorney Murphy then testified that defendant admitted that, at the time of the shooting, he was "f'd up from pills and marijuana, doesn't know why he shot the guy, but he did." Attorney Murphy stated that defendant did not ask him to speak with his doctor about his medications or mental capacity at the time of the shooting, but that he explored that area. He also conducted research about being high on marijuana and pills but learned that it would not amount to a defense. Thus, he did not pursue it as part of his trial strategy. Moreover, nothing occurred before trial

---

[5]The record does not clarify why attorney Murphy spoke with codefendant.

that indicated to Attorney Murphy that defendant needed a BCX. However, after trial, Attorney Murphy went into the bullpen area and saw that defendant was trying to hang himself with a white towel, so he then requested a BCX, after which defendant was found to be sane and fit for sentencing.

¶ 47       Attorney Murphy testified in support of his theory of self-defense. He argued during trial that the victim made a furtive gesture as if he were pulling out a gun. Attorney Murphy also testified that defendant never told him that he did not want to concede that he shot the gun and that defendant never told him that he did not shoot the gun. He did not recall telling defendant that he would receive a 100-year sentence if he told the judge that he did not shoot anyone and stated that it was not something that he would say.

¶ 48       After attorney Murphy's *Krankel* testimony concluded, APD Barrett said that he was going to send out subpoenas for potential rebuttal evidence that day. The trial court granted APD Barrett's request to continue the case until June 25, 2019, for possible rebuttal argument. On that date, the trial court granted APD Barrett another continuance for rebuttal evidence as well as argument. On August 6, 2019, APD Barrett informed the trial court that he located his rebuttal witness Sims and that he was in communication with the State to have Sims brought to court. APD Barrett made an offer of proof that Sims would testify that while he was incarcerated, Braxton indicated to him that if defendant paid Braxton $3000, Braxton would not testify against defendant. However, if Braxton did testify, then defendant would spend the rest of his life in jail. The trial court granted another continuance to have Sims brought to court. Defendant also told the trial court that his family was in the process of looking for private representation.

¶ 49    On November 5, 2019, attorney Saani Mohammed appeared on defendant's behalf and APD Barrett withdrew as counsel. Defendant indicated to the trial court that APD Barrett had no experience with *Krankel* evidentiary hearings, and he believed that APD Barrett was not effectively representing him at the hearing. Specifically, defendant stated that APD Barrett refused to cross-examine attorney Murphy on matters that defendant asked him to and refused to allow defendant to assist in his own defense during the evidentiary hearing. The matter was then continued several times for more than a year to allow attorney Mohammed time to get the transcripts and to get up to speed. On December 3, 2020, attorney Mohammed requested another continuance to conclude the *Krankel* hearing. The trial court told attorney Mohammed that the hearing had been completed, and the State agreed with the court's recollection. The trial court informed attorney Mohammed that he just needed to file a posttrial motion at that point, to which he agreed.

¶ 50    Attorney Mohammed filed a motion for new trial on February 3, 2021, and a hearing was held remotely via Zoom teleconferencing. The record reflects that the trial judge was at the criminal court building on the day of the hearing. Prior to hearing the motion, the trial court indicated that defendant was before the bench, his attorney was on camera, and the State was present in court. The trial court did not ask defendant whether he wished to waive his right to appear in person with counsel at the hearing.

¶ 51    Attorney Mohammed argued for a new trial because attorney Murphy was ineffective and because the evidence did not prove defendant guilty beyond a reasonable doubt. He contended that attorney Murphy made a mistake by failing to interview codefendant and Sims and that there was a potential conflict of interest because attorney Murphy was representing codefendant's attorney in an ARDC matter. Attorney Mohammed asserted that codefendant

would have known if defendant had a gun and discarded it because they were in the same vehicle and contended that attorney Murphy should have called an expert in eyewitness identification.

¶ 52    Following the State's argument, the trial court recalled the evidence presented at trial and concluded that the State had a very strong case, regardless of whether attorney Murphy had argued self-defense or reasonable doubt. In particular, the court noted the various videotapes, defendant's presence at the scene, defendant's clothing that was identified by the witnesses and that he was later arrested in, defendant's flight, and the gun found on the path of the pursuit. The trial court also indicated that it admonished defendant about the potential penalties and the difference between a bench and jury trial and that defendant indicated twice, orally and in writing that he wanted a bench trial. The trial court denied defendant's motion for new trial because the result would have been the same regardless of the defense theory of the case because of the compelling nature of the State's evidence.

¶ 53    Defendant protested the trial court's ruling but the trial court stood by its ruling, stating that defendant was repeating the same things his attorney said.

¶ 54    On June 9, 2021, defendant's sentencing hearing was held via Zoom teleconference, with defendant appearing on Zoom. The trial court did not ask defendant whether he wished to waive his right to appear in person, with counsel at the hearing. The record reflects that defendant refused to answer any questions for the presentence investigation (PSI), so the report is blank. The State presented defendant's criminal history in aggravation. In mitigation, attorney Mohammed argued that defendant's last conviction was from 2002 and that defendant's mental health, history of bipolar disorder, limited formal education, and the lack of familial support and employment before the shooting were mitigating factors. During the

hearing, defendant requested to speak with his counsel, and the trial court told him "one second." However, the record does not reflect that defendant ever spoke with counsel.[6] The trial court subsequently sentenced defendant to 50 years' imprisonment. Defendant's timely notice of appeal followed on June 11, 2021.

¶ 55                                    II. ANALYSIS

¶ 56       On appeal, defendant raises the following constitutional issues: (1) his trial counsel was ineffective for failing to call an expert on eyewitness testimony and failed to disclose a potential conflict of interest, (2) he received an insufficient *Krankel* hearing where the trial court did not allow defendant to present rebuttal evidence, and (3) the trial court failed to get defendant's waiver for in-person hearings before holding his sentencing hearing remotely on Zoom, without counsel being in the same location as defendant. Defendant does not challenge the sufficiency of the evidence in support of his conviction.

¶ 57                      A. Ineffective Assistance of Trial Counsel

¶ 58       Defendant first contends that his trial counsel, attorney Murphy, was ineffective for failing to call an expert to challenge the eyewitness testimony presented at trial. He also contends that trial counsel was ineffective for failing to disclose a potential conflict of interest—namely, that he simultaneously represented codefendant's counsel in an unrelated ARDC matter during defendant's trial.

¶ 59                  1. General Principles and Applicable Standards of Review

---

[6]Although the record indicates that the trial court stated that defendant was present in court, this court granted a motion to supplement the record with posttrial counsel's affidavit that defendant was not actually present in the courtroom and that all parties appeared on Zoom.

¶ 60    A criminal defendant has the right to the effective assistance of counsel under both the United States and Illinois Constitutions. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). In determining whether a defendant was denied effective assistance of counsel, this court applies the familiar two-prong test set forth in *Strickland*. A defendant must demonstrate that (1) trial counsel's representation was deficient and (2) the deficient performance prejudiced defendant. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9. If a defendant fails to establish either prong, his claim of ineffective assistance of counsel fails. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). We analyze claims of ineffective assistance of counsel by considering the entire record. *Burnett*, 2019 IL App (1st) 163018, ¶ 9.

¶ 61    It bears mentioning that a reviewing court often cannot entertain a claim of ineffective assistance of counsel on direct appeal when the claimed error was not a focus in the case below. *Id.* ¶ 11 (citing *Massaro v. United States*, 538 U.S. 500, 504-05 (2003)). However, in this case, because defendant raised the issue of ineffective assistance of counsel after trial and a *Krankel* hearing was held, the issue was sufficiently raised below. Thus, we can review it in this direct appeal.

¶ 62    On appeal, the standard of review changes, depending on whether the trial court did or did not determine the merits of defendant's *pro se* posttrial claims of ineffective assistance of counsel. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. Our supreme court has held that if the trial court made no determination on the merits, then our review is *de novo*. *Id.* (citing *People v. Moore*, 207 Ill. 2d 68, 75 (2003)). However, if a trial court has reached a determination on the merits of defendant's ineffective assistance of counsel claim, we will reverse only if the trial court's action was manifestly erroneous. *Id.* (citing *People v. McCarter*,

385 Ill. App. 3d 919, 941 (2008)). "Manifest error" is error that is clearly plain, evident, and indisputable. *Id.* (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 63    In this case, the trial court addressed defendant's claim that his trial counsel was ineffective for failing to call an expert witness on eyewitness testimony but did not address defendant's claim that his trial counsel was ineffective for failing to disclose a potential conflict of interest. Thus, we will review defendant's claim that trial counsel was ineffective for failing to call an expert witness under the manifest error standard, and we will review defendant's claim that trial counsel was ineffective for failing to disclose a potential conflict under the *de novo* standard.

¶ 64                    2. Failure to Call an Expert Witness on Eyewitness Testimony

¶ 65    Defendant first contends that trial counsel was ineffective for failing to investigate and call an expert witness to testify about eyewitness testimony. He argues that he was identified as the shooter by "two strangers who observed the shooting from a distance in the dark of night in chaotic circumstances." Defendant also contends that even though he requested that attorney Murphy investigate and call an expert in eyewitness identification, attorney Murphy refused to do so, believing that the issue of identification was not important in light of the surveillance video footage. However, defendant maintains that none of the video footage showed the shooting or showed defendant with a gun; at best, the video showed that defendant was with the victim around the time of the shooting and fled from the scene afterwards. He contends that the videos showed the presence of many other people outside at the time of the shooting, and given the fact that there was no confession or forensic evidence linking defendant to the shooting, counsel was ineffective for failing to interview and call an identification expert to explain the weaknesses in eyewitness identification testimony.

¶ 66    As noted above, this argument was addressed on the merits by the trial court during defendant's posttrial *Krankel* hearing. Thus, our review is based on the manifest error standard. *Id.*

¶ 67    After consideration of all of the evidence presented at defendant's bench trial, we find that even if attorney Murphy's decision not to call an expert in eyewitness testimony was deficient, defendant cannot prevail because he cannot establish prejudice. See *People v. Johnson*, 2021 IL 126291, ¶ 54 (an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment). *Strickland* asks whether it is "reasonably likely" that the result would have been different; a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is a " 'probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). *Strickland* requires a defendant to "affirmative prove" that prejudice resulted from counsel's errors. *Strickland*, 466 U.S. at 693. Satisfying the prejudice prong requires a showing of actual prejudice, not simply speculation that defendant may have been prejudiced. *Johnson*, 2021 IL 126291, ¶ 55.

¶ 68    Here, defendant contends that trial counsel was ineffective for failing to investigate and present an expert in eyewitness testimony because his conviction was solely based on the testimony of eyewitnesses who were "strangers who observed the shooting from a distance in the dark of night in chaotic circumstances." Defendant argues that the eyewitness identification testimony was a crucial part of the State's case, as only Williams and Braxton identified defendant as the shooter. Defendant concedes that there was other evidence that placed defendant at the scene of the shooting, but also asserts that Freeman, the only witness to see the actual shooting, was unable to provide an identification of the shooter. He also argues that

his GSR test did not show the presence of gunshot residue; thus, the State's case was purely circumstantial, and Williams's and Braxton's testimonies were critical.

¶ 69    In *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 53, this court noted that the efficacy of eyewitness testimony and current safeguards regarding its reliability was one of the most cutting-edge topics in modern criminal procedure and that the law was rapidly evolving. Later, in *People v. Lerma*, 2016 IL 118496, ¶ 25, our supreme court held that the trial court abused its discretion in denying defendant's request to allow expert testimony on the reliability of eyewitness identifications and the error was not harmless under the facts of the case. As defendant notes, in *People v. Hayes*, 2021 IL App (1st) 190881, ¶¶ 36-37, this court recently held that the defendant's trial counsel was arguably ineffective for failing to investigate and seek the admission of an expert in eyewitness testimony where (1) there were six eyewitnesses, but no physical evidence linking the defendant to the offense, (2) defendant made no omissions, and (3) several factors could have contributed to the stress of the event, including the presence and use of a weapon. We note that in *Hayes*, the defendant presented an alibi defense. *Id.* ¶ 12.

¶ 70    In his reliance on *Lerma* and *Hayes*, defendant contends that there were many reasons to question the accuracy of the witnesses' testimonies in this case and an expert could have shed light on those reasons. Additionally, an expert could have informed the trier of fact about the best practices regarding identification procedures and whether they were followed in this case, the low correlation between a witness's confidence and the accuracy of his identification, and an eyewitness identification becoming less reliable where a weapon is present.

¶ 71    As noted above, this argument was presented to the trial court; however, defendant did not attach an affidavit from an expert in eyewitness testimony or provide an expert in eyewitness

testimony at his *Krankel* hearing to establish what the expert testimony would have been in this case or how it could have been helpful. See *McGhee*, 2012 IL App (1st) 093404, ¶ 52 (defendant's postconviction petition included the affidavit of Dr. Loftus, who attested that he would have testified at trial about the influence of memory and perception of eyewitnesses, where the case against the defendant depended on the testimony of two eyewitnesses). Thus, defendant's argument amounts to mere speculation that is insufficient to survive the prejudice prong of *Strickland*.

¶ 72    Moreover, we disagree with defendant's characterization of the State's evidence presented at trial.

¶ 73    Williams, who worked in the liquor store, saw defendant enter the store. Defendant asked Williams where he could buy marijuana. Williams directed defendant to another person in the store, and he subsequently saw defendant leave the store with the victim. Williams clearly saw defendant in the lighted store environment and was able to identify defendant and his clothing. Additionally, Williams identified defendant in the store video, which showed defendant entering the store and having a conversation with him before going to speak to and exiting the store with the victim. Williams also walked out of the store moments after defendant and the victim and saw them talking before he saw defendant shoot the victim. Williams saw the victim fall to the ground and saw defendant shoot the victim again, then run across the street and get into a silver car. When the police arrived on the scene minutes later, Williams immediately told police that defendant shot the victim and was at the gas station in a silver car.

¶ 74    Braxton was also present at the scene. He was walking towards the restaurant at 51st Street and Indiana Avenue, when he saw a man shoot another man. Braxton stated that he saw the shooter's face and identified defendant in court as the man who shot the victim. After the

shooting, Braxton saw the victim fall to the ground and defendant run across the street and get into a car. He also saw defendant stuff the gun in the back of his waistband. When the police arrived, Braxton told them that defendant got into a car.

¶ 75    Additionally, Freeman testified that, while on his way to the liquor store, he saw two men talking nearby and then one of the men pulled out a gun and shot the other man at least two times. Freeman saw the victim fall to the ground and the man shoot the victim again. However, Freeman did not see either man's face, and the victim's back was to Freeman. None of the three eyewitnesses testified that there were other people near defendant and the victim prior to the shooting.

¶ 76    In addition to the eyewitnesses, all of whom saw the shooting, the State presented additional evidence. The silver car identified by Williams was blocked in at the gas station by police and was subsequently chased through the neighborhood by multiple police units and onto the expressway before it crashed at the 43rd Street exit ramp. After the crash, defendant jumped out of the car and ran up the embankment, where he was subsequently captured and arrested. After defendant's capture and arrest, Williams and Braxton went to the police station and identified defendant in a lineup. One of the officers retraced the pursuit route and found a 9-millimeter gun in front of a building on the route. The casings and bullets removed from the scene matched that weapon. There was also evidence presented that the type of gunshot wounds the victim sustained corroborated Freeman's testimony that the victim was shot additional times while he lay on the ground. The State also presented video evidence showing defendant inside of the store, defendant leaving the store, defendant's clothing, defendant talking with the victim before the shooting, defendant running to the gas station after the shooting, and defendant getting into the car with codefendant. There was also police dashcam

video of the chase involving the silver or gray vehicle with defendant inside, the crash, defendant's exit from the vehicle and attempts to escape, as well as his eventual capture.

¶ 77     Defendant is correct that the State presented circumstantial evidence against him. However, the trier of fact heard the evidence and was not obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt. *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). An inference is a factual conclusion that can rationally be drawn by considering other facts. *Id.* at 416. Thus, an inference is merely a deduction that the fact finder may draw in its discretion, but it is not required to draw as a matter of law. *Id.* A conviction can be sustained upon circumstantial evidence, as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the factfinder must disregard the inferences that flow normally from the evidence before it. *Id.* at 417. Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish the guilt or innocence of defendant. *Id.* The trier of fact does not have to be satisfied beyond a reasonable doubt of every link in the chain of circumstantial evidence. *Id.* It is sufficient if all the evidence taken as a whole satisfies the trier of fact beyond a reasonable doubt. *Id.*

¶ 78     In finding defendant guilty, the trial court noted that defendant ran immediately after the shooting and fled from police indicating his consciousness of guilt. Flight can be considered some evidence of a guilty mind. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64. In particular, a defendant's flight from police also may indicate consciousness of guilt. See *People v. Ross*, 2019 IL App (1st) 162341, ¶ 32. In this case, there was video evidence presented that showed defendant run away from the scene of the shooting, where he was the only person with the victim just prior to the shooting, and run across the street to the gray car  that subsequently

led the police on a high speed chase through the neighborhood and onto the expressway. After crashing on the expressway, defendant ran from police before his subsequent capture.

¶ 79     Contrary to defendant's belief, the eyewitness testimony was not the sole evidence that supported his conviction. The record contained substantial circumstantial evidence, including defendant's flight and the subsequent police chase. We find that all of the evidence presented at defendant's trial, taken together, was sufficient to support defendant's conviction. Defendant's speculation about what an expert in eyewitness testimony could have testified to would not have overcome the other evidence presented. We therefore conclude that defendant has not established prejudice by attorney Murphy's failure to present the testimony of an expert on eyewitness testimony and it was not manifestly erroneous for the trial court to deny his ineffective claim on that basis.

¶ 80                    3. Failure to Disclose a Potential Conflict of Interest

¶ 81     Defendant next contends that his trial counsel was ineffective for failing to disclose a potential conflict of interest. He claims that because attorney Murphy simultaneously represented codefendant's trial attorney on an unrelated ARDC matter during defendant's trial, he was reluctant to interview and call codefendant to testify at defendant's trial. This potential conflict was not revealed until attorney Murphy's testimony at defendant's *Krankel* hearing. The trial court did not address this claim, so our review is *de novo*. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 82     Defendant alleges that his trial counsel's failure to disclose his contemporaneous representation manifested in attorney Murphy's reluctance to zealously pursue codefendant as an exculpatory witness on defendant's behalf. During the posttrial proceedings, defendant argued that codefendant would have testified that he was with defendant all day and never saw

him with a gun. Further, defendant stated that codefendant would have testified to facts showing how the police coerced "everything." He contends on appeal that attorney Murphy's decision not to aggressively pursue a waiver of codefendant's right against self-incrimination could have been due to his financial relationship with codefendant's counsel, not wanting to overwhelm codefendant's counsel, possibly negatively affecting codefendant's counsel in his misconduct case, or Murphy possibly advising codefendant's counsel on how to best represent his clients. Defendant does state that the details of this "potential" conflict are unknown, but that Murphy's representation was full of potential conflict that had to be disclosed and waived by defendant.

¶ 83    A defendant's sixth amendment right to the effective assistance of counsel includes the assistance by a lawyer whose allegiance to his or her client is diluted by conflicting allegations or inconsistent obligations. *People v. Larry*, 196 Ill. App. 3d 231, 235 (1990). Our supreme court has noted the contrast between *per se* conflicts and alleged conflicts. *People v. Clark*, 374 Ill. App. 3d 50, 61 (2007). A *per se* conflict of interest exists where " 'certain facts about a defense attorney's status were held to engender, by themselves, a disabling conflict.' " (Emphasis omitted.) *Id.* (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 14 (2004)). When a *per se* conflict of interest is shown, a defendant is not required to show prejudice resulting from the conflict to obtain relief. *Id.* A *per se* conflict of interest is grounds for reversal unless the defendant waived his right to conflict-free counsel. *Id.* Our supreme court has recognized three situations that create a *per se* conflict of interest: (1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution, (2) where defense counsel contemporaneously represents a prosecution witness, and (3) where defense counsel was a former prosecutor who had been personally involved with

the prosecution of defendant. *People v. Fields*, 2012 IL 112438, ¶ 18. To establish an actual conflict of interest, a defendant must identify an actual conflict that adversely affected his counsel's performance. *People v. Yost*, 2021 IL 126187, ¶ 38. The defendant is required to identify a specific deficiency in his counsel's strategy, tactics, or decision-making that is attributable to the alleged conflict. *Id.* Speculative allegations and conclusory statements are insufficient to establish an actual conflict of interest. *Id.*

¶ 84    It is unclear from defendant's brief whether he is alleging a *per se* conflict of interest or an actual conflict of interest, as he only states that there was a "potential" conflict of interest. Our examination of the circumstances presented indicate that there was no *per se* conflict of interest present as attorney Murphy did not have a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; did not contemporaneously represent a prosecution witness; and was not a former prosecutor who had been personally involved with the prosecution of defendant. Nor has defendant identified an actual conflict that adversely affected his counsel's performance. His allegations of a "potential" conflict amount only to speculative allegations and conclusory statements insufficient to establish an actual conflict of interest. Moreover, defendant has not overcome the presumption that attorney Murphy's ultimate decision not to pursue codefendant as a witness was trial strategy, considering that the proposed witness was a codefendant who was essentially charged with driving the getaway car and evading police after the shooting. Codefendant and defendant were both captured and arrested after a police chase, wherein the getaway car crashed into another vehicle. Whether to call certain witnesses is a matter of trial strategy and cannot serve as the basis of a *Krankel* claim. See *People v. Jackson*, 2020 IL 124112, ¶ 106. Based on the other evidence presented at defendant's trial, we cannot say that the decision not to call codefendant

as a witness was deficient performance or that defendant was prejudiced. Accordingly, we conclude that defendant's claim of ineffective assistance of counsel for failure to call codefendant as a witness must fail.

¶ 85                    B. Presentation of Rebuttal Evidence at *Krankel* Hearing

¶ 86        Defendant next contends that the trial court erred by denying him the opportunity to present a rebuttal case at the *Krankel* hearing to refute attorney Murphy's testimony due to the trial court's misapprehension of the procedural stage of the case. Defendant argues that he was deprived of the opportunity to present multiple witnesses to rebut attorney Murphy's testimony and prove that his representation was deficient. Defendant concedes that this issue was not raised in his posttrial motion and may be subject to forfeiture but argues that this issue can be reviewed under the second prong of the plain error doctrine because it undermined the fundamental fairness of the evidentiary hearing.

¶ 87        When a defendant has forfeited appellate review of an issue, the reviewing court will consider only plain error. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). The plain error doctrine is a narrow and limited exception. *People .v Hillier*, 237 Ill. 2d 539, 545 (2010). It bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *Thompson*, 238 Ill. 2d at 613. We will apply the plain-error doctrine when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity

of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.*

Under the second prong of plain error review, prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. *Id.*

¶ 88     The first step of plain error review is determining whether any error occurred. *Id.* In plain-error review, the burden of persuasion rests with the defendant. *Id.* Here, defendant contends that he was denied procedural due process at his *Krankel* hearing when the trial court denied him the opportunity to present a rebuttal case, which he argues is a structural error.

¶ 89     We begin by reviewing the purpose and procedures surrounding a *Krankel* hearing. The common law procedure developed from our supreme court's decision in *Krankel* is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. The goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal. *Id.* If defendant's allegations show that trial counsel may have neglected defendant's case, the court should appoint new counsel and set the matter for hearing. *People v. Ayers*, 2017 IL 120071, ¶ 11. If the court determines that the claims lack merit or pertain only to matters of trial strategy, then no further action is required. *Id.*

¶ 90     If the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous. *Jackson*, 2020 IL 124112, ¶ 98. Manifest error is error that is clearly evident, plain, and indisputable. *Id.*

¶ 91     Here, defendant's claims center on not being allowed to present rebuttal evidence. Proper rebuttal evidence answers or contradicts affirmative matters raised by a party during its case

in chief. *People v. Robles*, 314 Ill. App. 3d 931, 938 (2000). We find that any error committed by the trial court in not allowing defendant to present rebuttal evidence during the *Krankel* proceedings did not constitute manifest error for the following reasons.

¶ 92    First, the record refutes defendant's claims about the multiple witnesses that attorney Mohammed would have presented during rebuttal. The record reveals that attorney Mohammed requested several continuances in order to secure Sims as witness after the State presented its arguments at defendant's *Krankel* hearing. As noted above, Sims was an inmate in pretrial detention with defendant who allegedly told him that Braxton would not testify against defendant if he paid him $3000. On the date, attorney Mohammed asked the trial court for a continuance to present rebuttal evidence, he told the court that he had secured Sims, and no other witnesses were mentioned. Additionally, it was also revealed during the *Krankel* hearing that attorney Murphy was not aware of the alleged extortion by Braxton until the hearing, so presenting such evidence would have had no bearing the results of the *Krankel* hearing and would have only raised a potential challenge to the State's evidence. Because such evidence had no bearing on whether attorney Murphy was ineffective, the fact that it was not presented did not make the *Krankel* hearing fundamentally unfair. Where it can be determined that the petitioner was not harmed by the alleged constitutional deprivation and that further proceedings would be futile, harmless error analysis applies. See *People v. Pingelton*, 2022 IL 127680, ¶ 46. Thus, this issue is subject to a harmless error analysis.

¶ 93    Structural errors necessarily render a criminal proceeding fundamentally unfair or unreliable, are not subject to harmless error review, and thereby require automatic reversal. *Jackson*, 2020 IL 124112, ¶ 120. Conversely, where an error does not rise to the level of

structural error, then it does not require automatic reversal and is subject to harmless error review. *Id.*

¶ 94　　Errors that are subject to harmless error analysis are categorized as trial errors rather than structural defects. *People v. Jackson*, 2022 IL 127256, ¶ 37. Trial errors that are forfeited must be analyzed for prejudice under the first prong of plain error standards. *Id.* ¶ 74. As explained herein, defendant's claim of error is a trial error and is thereby subject to a first prong plain error analysis, where the evidence is closely balanced. Defendant, however, incorrectly alleges that his claim is a structural defect and, consequently, invoked only the second prong of the plain error rule, affecting the fairness and integrity of the judicial process despite closeness of evidence, which does not apply. *Id.* We therefore decline to review defendant's forfeited argument.

¶ 95　　　　　　　　　　　C. Waiver of In-Person Hearings

¶ 96　　Finally, defendant contends that the trial court failed to get defendant's waiver for in-person hearings before holding his motion for new trial and sentencing hearing via Zoom teleconferencing without counsel being in the same location as defendant. He argues that under Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020), which became effective in response to the Covid-19 outbreak, the trial court failed to secure a written waiver signed by defendant, which was required in order to proceed remotely during his sentencing hearing without defendant's in-person presence in court. Defendant also indicates that he was denied his right to confer with counsel at the hearings. Defendant's motion for new trial was heard on February 3, 2021, and his sentencing hearing was held on June 9, 2021.

¶ 97　　The State concedes that defendant's sentencing hearing was held remotely without a valid waiver and that defendant and his counsel were in separate locations during defendant's remote

hearing on his new trial motion. However, the State contends that defendant forfeited review of his argument that his sentencing hearing was held remotely by failing to object to or raise the issue in a posttrial motion. Defendant claims in his reply brief that the error can be reviewed under both prongs of plain error.

¶ 98    Rule 341(h)(7) provides that points not argued are waived and shall not be raised in the reply brief, in oral argument, or on a petition for rehearing. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, our supreme court has considered arguments raised for the first time in a reply brief (*People v. Williams*, 193 Ill. 2d 306, 348 (2000); *People v. Thomas*, 178 Ill. 2d 215, 235 (1997)). Thus, we will consider the merits of defendant's arguments.

¶ 99    It is well settled that the plain error doctrine allows a reviewing court to review unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Schroeder*, 2012 IL App (3d) 110240, ¶ 23. In addressing a plain error argument, we must first consider whether the error occurred at all. *Id.*

¶ 100    The right to be present is not an express right under the United States Constitution but is implied arising from the due process clause of the fourteenth amendment. U.S. Const., amend. XIV, § 1; *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). Article I, section 8 of the Illinois Constitution grants criminal defendants the express right to appear and defend in person and by counsel. Ill. Const. 1970, art. I, § 8. Accordingly, both the federal constitution and our state constitution afford criminal defendants the general right to be present, not only at trial, but at

all critical stages of the proceedings, from arraignment to sentencing. *Lindsey*, 201 Ill. 2d at 55.

¶ 101     A defendant's constitutional right to appear in person at a critical stage of his proceedings is not a substantial right in itself, but it is a means of securing other underlying substantial rights that may be affected by the proceeding. *People v. Bean*, 137 Ill. 2d 65, 80-81 (1990). Even where a defendant has the general right to be present because the proceeding is a "critical" stage, a defendant's absence is not a *per se* constitutional violation. *Lindsey*, 201 Ill. 2d at 57. Rather, a defendant's absence from such a proceeding will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right. *Id.* Some of these substantial rights are the right to confront witnesses, the right to present a defense, and the right to an impartial jury. *Bean*, 137 Ill. 2d at 81. A defendant cannot rely on broad principles that are not adapted to the specifics of his case; rather, whether the benefit of defendant's presence would have been just a shadow because the fairness of the trial was not affected by defendant's absence from a portion of his trial must be determined in light of the whole record. *Lindsey*, 201 Ill. 2d at 57. A defendant's presence is a condition of due process, however, only to the extent that a fair and just hearing would be thwarted by defendant's absence. *People v. Aguilar*, 2020 IL App (1st) 161643, ¶ 39 (citing *Bean*, 137 Ill. 2d at 83).

¶ 102     With those principles in mind, we turn first to defendant's motion for new trial held on February 3, 2021. As defendant acknowledges in his brief, this hearing was held before the amended supreme court rule took effect on February 11, 2021, and, thus, did not require a

written in-person waiver.[7] The record reflects that all parties appeared via Zoom, and at one point during the State's argument, defendant attempted to "clarify" attorney Murphy's testimony from the evidentiary hearing by addressing the court directly. However, the trial court stopped him from talking and told him to hold on and that he had a good lawyer. Defendant argues that he was not provided with the opportunity to privately confer with counsel about the matter and therefore he was never allowed the opportunity to bring the matter before the court's attention even though he had a lawyer. However, the record does not indicate that defendant ever requested to speak with his counsel privately regarding attorney Murphy's testimony at the prior *Krankel* hearing or that any breakout rooms were established for the Zoom hearing. During the court's ruling, the record indicates that defendant asked the trial court whether he could say something, but the trial court did not allow defendant to speak until after it denied the motion.

¶ 103    After a review of the record from defendant's motion for new trial, we find that no error occurred, even though the hearing on defendant's motion for new trial was held via Zoom teleconferencing and was held without a waiver of defendant's in person presence at the hearing. As noted above, the amendment to the supreme court rule requiring waiver of in-person hearings for hearings at which argument was heard did not occur until after the hearing on defendant's motion for new trial. Thus, the rule could not have applied, and defendant is not entitled to rely on it. The governing law must exist at the time. Unless there was an express provision for retroactive effect, it can only be applied prospectively. See *People v. Davis*, 97 Ill. 2d 1, 23 (1983) (the provisions relied on by defendant are of no avail since they were not

---

[7]As defendant notes in his brief, the prior supreme court amended rule that was in effect at the time of defendant's motion for new trial allowed for remote hearings without such a waiver and was adopted in response to the nationwide Covid-19 pandemic emergency.

in effect at the time the offense was committed). Here, because defendant was not required to waive his in person presence at the motion for new trial under the supreme rule then in effect, there can be no error in the failure to secure such a waiver.

¶ 104    Moreover, defendant was not entitled to be present for the motion for a new trial. As previously stated, while it is well-settled that a criminal defendant has a general right to be present at every stage of his trial (*People v. Lofton*, 194 Ill. 2d 40, 66 (2000); U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 8), the right to be present is not an absolute, inviolable right. A defendant is not denied a constitutional right every time he is not present during his trial, but only when his absence results in him being denied a fair and just trial (*Lindsey*, 201 Ill. 2d at 57). Nor is it a substantial right; it is a lesser right that is intended to secure the substantial rights of a defendant. *People v. Brown*, 2023 IL 126852, ¶ 15; *People v. Martinez*, 2021 IL App (1st) 172097, ¶ 36. Additionally, the "nearly unanimous rule in this country" is that the defendant's constitutional right to be present at the trial does not embrace a right to also be present at the argument of motions prior to trial or subsequent to verdict. *Lofton*, 194 Ill. 2d at 65; *People v. Woods*, 27 Ill. 2d 393, 395 (1963). It follows then that defendant was not entitled to be present during the motion for new trial, so there could be no error in failing to secure a waiver of his in-person presence.

¶ 105    Defendant, however, also argues on appeal that he was not allowed to confer with his counsel during the hearing on the motion for new trial, presumably raising a constitutional error of the denial of his right to counsel. We disagree.

¶ 106    First, as previously established, defendant had no constitutional right to be present for the motion for new trial. Second, and as noted above, the record does not indicate that defendant requested to speak with his counsel at any time during the hearing, only that he wanted to

address the trial court directly to clarify points argued by the State during its argument. The trial court had no responsibility to entertain defendant's attempts to address it directly during the hearing on his motion for new trial. An accused has either the right to have counsel represent him or the right to represent himself; however, a defendant has no right to both self-representation and the assistance of counsel. *People v. Pondexter*, 214 Ill. App. 3d 79, 87 (1991).

¶ 107        Although the trial court chose to hear oral arguments on the motion for new trial, it was not required to do so; the motion for new trial could have been decided by the trial court without oral argument. See *People v. DePompeis*, 410 Ill. 587, 595-96 (1951); *People v. Moczarney*, 65 Ill. App. 3d 410, 417 (1978) (where there is no reversible error committed in the course of a trial, the refusal to hear argument on a motion for new trial cannot injure defendant and does not constitute a denial of due process). As such, it follows then that defendant was not entitled to confer with counsel during oral argument made on the motion for new trial and no constitutional right was violated. We find that the record does not support a conclusion that the motion for new trial was decided unfairly or resulted in the denial of an underlying substantial right where defendant had no ascertainable right to be present at the hearing. *People v. Patrasso*, 271 Ill. App. 3d 1087, 1091-92 (1994). Even if we found an error, at best it would be harmless error because defendant has failed to show how the waiver or allowing him to speak with his counsel would have changed the result of the proceeding that he had no right to be present for. *Id.* Thus, there was no error.

¶ 108        Because we have determined that there was no error, there could be no plain error. We therefore decline to address defendant's argument that his due process rights were violated by the trial court's failure to secure a waiver for his in-person presence at his motion for new trial.

¶ 109 We next turn to defendant's sentencing hearing, which was also held via Zoom teleconferencing without a waiver of defendant's in-person presence. Defendant argues that such hearing violated his constitutional rights and violated our supreme court's guidelines regarding remote hearings because he was deprived of the opportunity to privately confer with and assist his counsel during the proceedings. Specifically, defendant maintains that he requested to speak with his attorney after the State presented its evidence in aggravation and he was not allowed to.

¶ 110 As noted above, the State concedes that defendant's sentencing hearing was held remotely without a valid waiver but argues that defendant has forfeited this error because it was not properly preserved. However, we will consider the merits of defendant's argument under plain error, as requested by defendant in his reply brief. *Thomas*, 178 Ill. 2d at 235.

¶ 111 The plain error doctrine allows a reviewing court to review unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and integrity of the judicial process, regardless of the closeness of the evidence. *Schroeder*, 2012 IL App (3d) 110240, ¶ 23. Our first determination is whether there has been an error. *Id.*

¶ 112 As previously stated, a defendant's absence from a critical proceeding will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right. *Lindsey*, 201 Ill. 2d at 57. We find that the sentencing hearing is a critical proceeding that requires a defendant's presence with counsel because its outcome affects a substantial right-the defendant's freedom.

¶ 113     Our supreme court enacted several amendments to its rules concerning court appearances and trials in response to the COVID-19 emergency between March 2020 and February 2023. The supreme court's order of February 11, 2021, mandated that legal hearings with argument and sentencing hearings may not be held remotely unless the defendant waives his right to an in-person hearing. Ill. S. Ct., M.R. 30370(II)(A) (eff. Feb. 11, 2021). The order also provided that the decision to waive in-person proceedings belonged to the defendant, not defense counsel, and must be in writing. Ill. S. Ct., M.R. 30370(II)(B), (C) (eff. Feb. 11, 2021). Moreover, before a waiver of in-person proceedings could be accepted by the trial court, it must ensure that the waiver was knowing and voluntary and that the defendant discussed the waiver with counsel prior to the hearing. Ill. S. Ct., M.R. 30370(II)(D) (eff. Feb. 11, 2021).

¶ 114     Defendant has not cited, nor have we found, any criminal case that addresses sentencing hearings held via Zoom teleconferencing under the modified rules during the Covid-19 emergency. While our research did reveal that there have been several cases involving parental rights matters that addressed the issue of hybrid hearings or fully remote hearings, those cases do not fall under the supreme court's modified rule of February 11, 2021, which specifically refers to remote sentencing hearings. Thus, those cases are distinguishable from the particular issue raised in this case.

¶ 115     The record establishes that defendant's sentencing hearing was held on June 9, 2021, via Zoom teleconferencing with all parties appearing on screen, despite the trial court's statement that defendant was present in court. The record does not contain any evidence that a written waiver of defendant's in-court presence was received by the trial court before the sentencing hearing was held. Additionally, the record does not indicate that defendant was provided with a means to communicate in private with his attorney during the sentencing hearing (through a

breakout room or other means), even after requesting to speak with his attorney during the sentencing hearing. We find that defendant's sentencing hearing was held in error, without defendant's waiver and without allowing defendant an opportunity to speak with his counsel privately. We find this to be a violation of defendant's constitutional rights to due process, as well as a violation of our supreme court's modified rule of February 11, 2021. We therefore remand for a new sentencing hearing. Defendant's conviction is affirmed in all other respects.

¶ 116                                   III. CONCLUSION

¶ 117        In conclusion, we find that defendant did not establish that his trial counsel was ineffective for failing to investigate and present the testimony of an expert in eyewitness testimony; the trial court erroneously disallowed defendant the opportunity to present rebuttal evidence during the *Krankel* proceedings, but such error was harmless; and defendant did not properly preserve review of his argument that his constitutional rights were violated when his motion for new trial was heard via Zoom teleconferencing. However, we find it was error to hold defendant's sentencing hearing via Zoom teleconferencing without a valid waiver from defendant and without allowing him the means to confer confidentially with his counsel. We affirm defendant's conviction and remand for a new sentencing hearing.

¶ 118        Affirmed and remanded with directions.

¶ 119        JUSTICE TAILOR, concurring part and dissenting in part:

¶ 120        I concur in the majority's decision that plain error occurred because Harris was denied his right to due process when the court proceeded to sentencing without obtaining a written waiver from Harris of his right to an in-person hearing, as required by our supreme court's mandate. See Ill. S. Ct., M.R. 30370 (eff. Feb. 11, 2021). However, I disagree with the majority's decision that no error occurred with respect to the hearing on Harris's motion for a new trial,

- 40 -

which also proceeded remotely without Harris's waiver of his right to an in-person hearing. The absence of a waiver necessitates a new hearing in both instances because it directly implicates an essential aspect of a defendant's right to counsel—the ability of a defendant to confer with and assist his counsel during a hearing. I would go further than the majority does in this case because the rationale that requires a new sentencing hearing also requires a new hearing on the motion for new trial. Therefore, I concur in part and respectfully dissent in part.

¶ 121     Harris argues that a written waiver of his right to an in-person hearing on his motion for a new trial was required under the Illinois Supreme Court's mandate of March 17, 2020, related to the COVID-19 pandemic (Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020)), and under section 106(D)-1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/106D-1(a) (West 2020)). The March 17, 2020, version of the mandate stated, "[e]ssential court matters and proceedings shall continue to be heard by the Illinois courts. If feasible and *subject to constitutional limitations*, essential matters and proceedings shall be heard remotely via telephone or video or other electronic means." (Emphasis added.) Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). As for section 106(D)-1(a), although a motion for new trial is not specifically enumerated as one of the proceedings allowed to occur by either closed circuit television or video conference for certain criminal proceedings (see 725 ILCS 5/106D-1(a) (West 2020) (specifying court proceedings that may be held remotely)), subsection 1(c) allows "other court appearances through the use of a two-way audio-visual communication system if the person in custody or confinement waives the right to be present physically in court." *Id.* § 106D-1(c).

¶ 122     The State offers no real, substantive response to Harris's argument. Rather, the State argues that Harris forfeited his claim and that Harris was actually present before the court, which is contradicted by Harris's counsel, who avers in an affidavit that the hearing was conducted

remotely and that Harris was not present in the courtroom but also appeared remotely. The State appears to acknowledge the latter point in its brief when it says, " 'both sides' may have appeared via teleconferencing." Also, the State does not dispute that Harris's right to counsel includes the right to confer with his counsel privately during the course of a hearing.

¶ 123   To be clear, Harris was "present before the bench" at the hearing on his motion for a new trial via videoconference and was represented by counsel of record, who was also "on camera," although from a location different than Harris. There is no dispute that Harris was "present" for the entirety of the argument on the motion and for the court's oral decision on the motion, meaning that he was able to see and hear the proceedings via remote video conference. *Cf. People v. Lofton*, 194 Ill. 2d 40, 63-65 (2000) (the defendant was not transported from jail to be present at a section 115-10 hearing and was deprived of due process as a result of being absent from a critical stage proceeding). Harris was as "present" as the COVID-19 pandemic precautions in existence at the time would allow.

¶ 124   Yet, the majority embarks on an analysis of whether a waiver was necessary in this case based on whether Harris had a constitutional right to be present at the hearing on the motion for a new trial. *Supra* ¶ 104. This is not the issue Harris raises. Harris's argument is that his sixth amendment right to counsel was violated because he was denied the right to confer with and assist his counsel during the hearing because he was not physically in court with his counsel by his side or given the opportunity to confer privately with his counsel in a "break out" room in the Zoom application. The issue of the waiver of an in-person hearing in the context of this case is central to the traditional understanding that being "present" in court is appearing in the courtroom, before the bench and with counsel at the defendant's side, and having the opportunity to confer with counsel and assist counsel in person. Thus, Harris is

arguing that because he did not waive his right to an in-person hearing, he did not waive his sixth amendment right to be able to confer with counsel during the hearing.

¶ 125     The sixth amendment guarantees an accused a right to assistance of counsel in a criminal proceeding. U.S. Const., amend. VI. "A defendant is entitled to the representation of counsel at all critical stages of a criminal prosecution, and this important right will not be taken away unless affirmatively waived by a defendant." *People v. Burton*, 184 Ill. 2d 1, 22 (1998). The Supreme Court has established that a defendant's right to counsel attaches "at or after the time that adversary judicial proceedings have been initiated against him" (*Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (opinion of Stewart, J., joined by Burger, C.J., and Blackmun and Rehnquist, JJ.)), and once a defendant's right to counsel attaches, the right continues to apply "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." *Mempa v. Rhay*, 389 U.S. 128, 134 (1967). A particular stage is deemed critical if "certain legal rights may be lost if not exercised at this stage." *Id.* at 134-35. A posttrial motion for new trial is a "critical stage" in criminal proceedings in Illinois, at which a defendant is entitled to counsel (*People v. Finley*, 63 Ill. App. 3d 95 (1978)), because any error not raised with specificity in a motion for new trial is deemed waived for purposes of appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 126     An essential aspect of the sixth amendment right to counsel is the ability to confer with and assist counsel. *People v. Noble*, 42 Ill. 2d 425, 429-30 (1969) (defendant was denied his sixth amendment right to counsel where defendant was not permitted to consult with counsel during an overnight recess in jury trial); *People v. Woosley*, 2020 IL App (3d) 170307, ¶ 17 (defendant was denied his sixth amendment right to counsel where defense counsel was present at the arraignment by telephone, which did not afford "any opportunity for confidential

communication" between defendant and counsel); *Geders v. United States*, 425 U.S. 80, 91 (1976) (order preventing petitioner from consulting with his counsel during recess impermissibly impinged on his sixth amendment right to assistance of counsel). Our review of whether a defendant was denied his or her right to counsel is *de novo*. *People v. Abernathy*, 399 Ill. App. 3d 420, 426 (2010).

¶ 127    Although Harris was "present" remotely at the hearing on the motion for new trial and was represented by counsel who appeared remotely from another location, Harris did not waive his right to an in-person hearing, including his right to confer with and assist counsel during the hearing. This resulted in a violation of his sixth amendment right to counsel, where he did not knowingly or voluntarily waive this right, and no opportunity to confer with his counsel was provided to him during the proceeding. *Cf. In re Es. C.*, 2021 IL App (1st) 210197, ¶¶ 9, 28 (affirming parental termination occurring remotely where the trial court safeguarded the parent's due process rights by providing her with regular and frequent opportunities to confer with counsel in virtual breakout rooms); *In re R.D.*, 2021 IL App (1st) 201411, ¶¶ 8, 15 (affirming parental terminations occurring remotely where respondents received "every opportunity" to confer with counsel and could view and hear the witnesses as they testified); *In re P.S.*, 2021 IL App (5th) 210027, ¶¶ 60, 63 (affirming parental termination occurring remotely where the father was virtually present and was heard and the court repeatedly stopped the proceeding to permit him to confer privately with counsel).[8]

---

[8]The right to be represented by counsel in termination cases originates in the Juvenile Court Act of 1987 (705 ILCS 405/1-5(1) (West 2020)) and not from the sixth amendment, which applies to criminal defendants. See U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defense"). "Though the statutory right to counsel in proceedings under the Juvenile Court Act lacks constitutional footing *** that right is closely linked to its constitutional counterpart ***." *In re Br. M.*, 2021 IL 125969, ¶ 42.

¶ 128      Nor am I persuaded by the majority's rejection of Harris's claim based on his failure to ask to speak with his lawyer privately during the hearing. *Supra* ¶ 105. Here, the court conducted an evidentiary hearing on Harris's *Krankel* motion, wherein he alleged ineffective assistance of trial counsel, which the court then denied. Harris's subsequent motion for a new trial raised two issues: the sufficiency of the evidence and trial counsel's ineffectiveness. The record shows that during the hearing on the motion for new trial, Harris tried to address the court with regard to something his allegedly ineffective trial counsel had testified to at the *Krankel* hearing regarding the defense he presented on Harris's behalf. However, the trial court cut him off before he could communicate the substance of his concern and told him that he could not speak, stating that he had "a good lawyer." Had Harris been present with his counsel at his side or had the trial court permitted Harris and his counsel to confer privately in a Zoom "break out" room, then Harris could have conferred with his counsel regarding this testimony, and other information he wanted to share, and his counsel could have communicated to the court any points or issues he deemed appropriate. The record shows that Harris eventually was allowed to speak, but only spoke to the court, and after the court had already denied his motion for a new trial. Under these circumstances, Harris cannot be faulted for failing to specifically ask the court to speak privately with his lawyer. I would therefore find that an error did in fact occur when Harris was unable to confer with counsel during this critical proceeding. The type of representation afforded to Harris in this remote proceeding is not the type of representation contemplated by the sixth amendment. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S. 60, 76 (1942).

¶ 129    I also would find that this error amounted to reversible error under the second prong of the plain error doctrine. This prong allows a court of review to consider unpreserved error if "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The denial of Harris's right to counsel affects Harris's substantial rights and, therefore, is plain error under the second prong of the plain error doctrine. *People v. Vernon*, 396 Ill. App. 3d 145, 150 (2009). I would therefore vacate both the order denying his motion for a new trial and the order imposing sentence and remand for a new hearing on the motion for new trial. If the motion for new trial were denied, then a sentencing hearing would be held, with Harris present with his counsel by his side in each instance, unless he waives his right to be present.

*People v. Harris*, 2023 IL App (1st) 210754

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-02582; the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas Harvath, Brian K. Hodes, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People. |