2026 IL App (1st) 240468-U

No. 1-24-0468

Order filed May 8, 2026

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 10560 01 |
| | ) | |
| AVIOR THURMAN, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Mikva and Wilson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm where the trial court did not err in granting the State's motion to extend the speedy trial term for a short period of time to determine if a witness could be located; the trial court's decision that trial counsel did not provide ineffective assistance of counsel by failing to pursue an imperfect self-defense theory was not manifestly erroneous; and defendant's 65-year sentence for first degree murder with the personal discharge of a firearm enhancement was not an abuse of discretion.

¶ 2     Following a jury trial, defendant Avior Thurman was convicted of first degree murder with the personal discharge of a firearm and Class X aggravated battery. He was subsequently sentenced to 65 years for murder (40 years plus a 25-year firearm enhancement), and a consecutive 15 years for aggravated battery. On appeal, defendant contends that: (1) the trial court abused its discretion in granting the State's motion to extend the speedy trial term where there were no reasonable grounds to believe that a witness would be located; (2) whether the trial court was ineffective for failing to pursue a second degree murder theory where there was some evidence to support the claim that defendant had an unreasonable belief in the need for self-defense after someone shot at him; and (3) alternately, whether his sentence should be reduced or the matter remanded for a new sentencing hearing where the trial court failed to consider as a mitigating factor that there were substantial grounds tending to excuse or justify defendant's criminal conduct, though it failed to establish a defense. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant and codefendant Ruben Rhodes were arrested and charged in a nine-count indictment with six counts of first degree murder, two counts of attempted murder, and one count of aggravated battery, all arising from the shooting death of 16-year-old Daishawn Moore and the shooting of Dakia Spearman on May 28, 2017. Defendant and Rhodes were tried separately by different juries, with defendant being ultimately found guilty of first degree murder with the personal discharge of a firearm.

¶ 5                              A. Pretrial Proceedings

¶ 6     The record reveals that from December 2020 to March 2021, the State told the trial court that it was talking to the victim's family about making an offer in this case. Defendant's trial

counsel responded that he was not looking for an offer but wanted a trial. Trial counsel acknowledged that COVID precautions and restrictions then in effect by the Illinois Supreme Court had suspended speedy trial demands. On July 26, 2021, the assigned prosecutor indicated that she was in the process of reaching out to all witnesses who would be testifying in both jury trials and securing everyone's "bad dates" to ensure that the agreed upon November19, 2021, trial date worked.

¶ 7      On September 8, 2021, the trial court noted that defendant's case (and codefendant's case) were its oldest cases, and that it would not grant any continuances unless there was a really good reason. The prosecutor again indicated that she was going through all of the detectives and officers but was on target for the November court date. On October 26, 2021, the State indicated that it was still contacting witnesses but wanted to keep the November date. On November 19, 2021, defendant moved to reset the trial date because trial counsel had a scheduling conflict. The State also moved for a continuance because many of their Chicago police officer witnesses were still on furlough. The trial court granted both motions and rescheduled defendant's trial for March 25, 2022. On February 15, 2022, a new prosecutor assigned to the case stated that she wanted to keep the March trial date at that time. Defendant's trial counsel indicated that defendant may be seeking to demand trial at some point but agreed to a continuance at that time. On March 8, 2022, the new prosecutor answered not ready for the March 25, 2022, trial date and the new date of April 11, 2022, was reserved by agreement. However, on that date, the parties agreed to reset the trial for June 10, 2022.

¶ 8      On June 9, 2022, the State moved for a continuance of the trial because it was unable to serve several essential witnesses. The following day, defendant's trial counsel indicated that if the

State did not proceed at the next court date, defendant would demand trial. Defendant subsequently filed a written demand for trial on July 19, 2022. The State answered "not ready" for trial on August 12, and September 9, 2022. The parties agreed to reschedule the trial on September 9, 2022, however, the State again answered "not ready" on October 3, 2022, indicating that it could not answer ready due to missing witnesses and that the 120-day speedy trial term date was October 13, 2022.

¶ 9     On October 11, 2022, the State filed a petition for a 60-day extension of the statutory speedy trial term to locate Ebonie Washington (Ebonie), who had a rule to show cause entered against her and an active arrest warrant. The petition also stated that the State needed additional time to locate and serve Alexus Mack and Tarvis Washington (Washington), who were eyewitnesses to the murder and identified defendant as the shooter. According to the petition, Mack and her mother told the State that Mack would not come to court to testify and several investigators were unable to locate her. The State unsuccessfully attempted to serve Washington on May 8, 2022, May 19, 2022, May 24, 2022, and May 26, 2022, at three addresses in Chicago and one address in Westmont, Illinois. On August 12, 2022, Washington renewed his state identification, which listed a new address for him in Riverdale, Illinois. However, investigators were still unable to locate Washington after going to that address and additional addresses they had for him in Chicago on August 22, 2022, August 23, 2022, September 26, 2022, September 28, 2022, September 29, 2022, October 5, 2022, and October 6, 2022. On October 9, 2022, the prosecutor ran a computer search for Washington and learned that he was arrested on October 6, 2022, in Iowa. After contacting the local jail, the prosecutor learned that Washington was released on his own recognizance on October 7, 2022, and a prosecutor indicated that Washington was due

for arraignment and provided two addresses in Iowa for Washington. The petition included photos of Washington's mugshot and tattoos.

¶ 10    The trial court ruled on the petition the same day, stating that it "absolutely" found that the State used reasonable efforts to try and find Mack, Ebonie and Washington. However, the trial court granted the petition for Washington only and only for a period of five days past the speedy trial term limit. The court opined that it should be easy for the State to locate him and found that the State showed reasonable grounds to believe that they could secure Washington because they knew that he was arrested in Iowa, had two addresses for him in Iowa and would start the process for Washington to be served in Iowa and compel his presence in Illinois. The trial court then continued defendant's trial for one week to October 18, 2022, for status on service of  Washington in Iowa, and steps taken to compel his appearance in Illinois. The court also granted the State's request to certify Washington as a material witness.

¶ 11    At the next court date on October 18, 2022, the State announced that Mack was present in court and that Ebonie was arrested on the warrant, but they still had not found Washington. The prosecutor explained that she spoke with a prosecutor in Iowa who advised her that material witness papers were filed the week prior and that Washington had an October 17, 2022, court date. After speaking with the Iowa prosecutor, the State learned that Washington had still not been served the papers despite efforts to locate him; the Fort Dodge, Iowa Police Department issued a "be on the lookout" for Washington which was issued to the Webster County Sheriff's Office as well as other local law enforcement agencies in the county. The Iowa prosecutor also advised the State that Washington was scheduled for an in-person arraignment for his criminal case in Iowa on October 31, 2022. The State again requested additional time, until Washington's Iowa

arraignment, to locate him. Defendant objected and continued his trial demand. An off-the-record conversation was held between the trial court and the parties, and the court subsequently granted the State's request for continuance to November 4, 2022.

¶ 12    On November 4, 2022, the State indicated that Washington still had not been located, and it had no new information about his whereabouts as he failed to appear for his arraignment in Iowa. The State then answered ready for trial. Defendant in turn filed a motion to dismiss based on a violation of the 120-day speedy trial term. The trial court denied defendant's motion, stating that the fact that Washington did not show up for his court date in Iowa did not mean that its ruling in granting the State's extended term request was wrong. The court reiterated that it found then and still found that the State made good faith efforts to get Washington in court. The court further stated that it let the parties know on numerous occasions that it would not grant any further continuances, did not grant the 60-day request but exercised its discretion to give the State some additional time, which ran out.

¶ 13                              B. Trial Proceedings

¶ 14    At trial, Jamie Hamilton, Mack and Spearman testified that, in the early evening hours of May 28, 2017, they were with Hamilton's boyfriend, Rhazsa Simmons[1] on the corner of 18th Street and St. Louis Avenue in Chicago. While standing there, they saw a gray car slowly drive by on 18th Street with three men inside who were wearing hoodies. The car turned onto St. Louis Avenue, drove down the block and turned into an alley. Approximately one minute later, the same car again drove slowly down 18th Street and again turned onto St. Louis. Spearman testified that all three occupants were wearing ski masks this time. She also saw a passenger in the car staring

_____

[1] Simmons was deceased at the time of trial.

at her, so she said "peek-a-boo." As the car turned onto St. Louis, Spearman and Mack saw Simmons shoot at the vehicle before he ran away as the car sped off down the street towards an alley. Hamilton heard shots but did not see who fired them.

¶ 15    Hamilton, Mack and Spearman testified that Moore was running towards them, asked what was going on and who was shooting. Hamilton told Moore that he should run because the car was coming back. Mack heard car wheels "screeching" in the nearby alley. Spearman and Moor ran down St. Louis, Hamilton hid behind a tree and Mack went towards her house. Hamilton, Mack and Spearman testified that the gray car came back a third time, this time driving fast and in the wrong direction down 18th Street and then St. Louis. Mack estimated that four or five minutes had passed between the second and third time she saw the gray car but was impeached with her prior statement that it was a minute or two. Spearman and Moore ran into a gangway off of St. Louis, approximately one house from Mack's residence. As the gray car stopped at the mouth of the gangway, Spearman heard and felt a gunshot "skit" by her, and she saw Moore get struck in the back by a bullet. Spearman was grazed by a bullet in her right shoulder. Mack saw the shooter from her house, who she described as a black man in a black hoodie shooting from the front passenger window over the hood of the gray car, and stated that the gray car just kept coming back. After hearing gunshots, Hamilton saw the gray car flee the area. Moore died from his injuries and an autopsy later revealed that he had one penetrating gunshot wound to the back which entered his left lung causing hemorrhage to the left chest cavity. The cause of Moore's death was a gunshot wound to his back and the manner of death was homicide.

¶ 16    Investigators arrived at the scene of the shooting and recovered five cartridge cases, metal fragments, blood, a right shoe, and metal clasps. All five cartridge cases were fired by the same

unknown semiautomatic pistol. Police subsequently obtained surveillance footage from several nearby businesses. Detective Thomas Bebe testified that he reviewed those surveillance videos and observed a gray Pontiac travelling around the 1800 block of South St. Louis at approximately 6:30 p.m. on May 28, 2017. Detective Bebe was able to see the vehicle's license plate by zooming in on one of the videos and was able to determine that codefendant Rhodes owned the vehicle. Hamilton also identified the gray Pontiac in the surveillance video footage at trial as the one involved in the shooting.

¶ 17   Defendant and codefendant Rhodes were both arrested near 4400 West Roosevelt Road in Chicago on June 15, 2017. The following day, Spearman met with police and identified codefendant Rhodes as the driver of the gray car but was not able to identify defendant in a lineup. Mack went to the police station the same day and identified defendant as the shooter in a physical lineup. Mack also wrote "shooter" on a picture shown to her by police and made the same indication in her grand jury testimony. Mack also identified defendant at trial as the shooter. However, Mack also testified at trial that she did not see the shooter's face, that she did not have a choice about viewing the lineup or testifying before the grand jury, and that a detective told her to write "shooter" on the photo. Mack did, however, admit that she was treated well by the police, that no one forced her to go to the police station, and that no one forced her to testify before the grand jury. On cross-examination, Mack testified that she was not sure that defendant was the actual shooter and that she might be mistaken. Nor did Mack recall seeing tattoos on the shooter's face and hand, which defense counsel indicated defendant had at trial. However, on redirect, Mack admitted to describing the shooter's gender, race, facial complexion, height, weight, and haircut

on the day of the shooting. On recross, Mack agreed with defense counsel that she may have consistently identified the wrong individual in this case as the shooter.

¶ 18    Assistant State's Attorney (ASA) Joy Tolbert Nelson testified that she met with Mack on June 16, 2017, and Mack consented to have their meeting video recorded. ASA Nelson stated that Mack was free to leave during their interview, Mack never said that she wanted to leave the police station, that she felt forced to be there, or that any officer threatened her. ASA Nelson also asked Mack if she was in the room with her freely and voluntarily, and she replied affirmatively.

¶ 19    ASA Nora Gill testified that on July 12, 2017, she met with Mack and presented her to the grand jury. She did not force Mack to testify before the grand jury and Mack was free to leave at any time. Mack never told ASA Gill that she felt threatened by police, felt forced to come to the grand jury, that she was forced to participate in a live lineup, or that any officer threatened her to do anything regarding the homicide investigation. ASA Gill further testified that Mack was very clear about seeing the shooter's face and being able to identify the shooter when testifying before the grand jury. The State then rested its case.

¶ 20    Defendant moved for judgment of acquittal, which the trial court denied. Defendant then rested without presenting any testimony or evidence. During closing argument, defense counsel argued that the State did not prove that defendant was the shooter beyond a reasonable doubt and that Mack's identification of defendant was not reliable. Defense counsel further noted Simmons started the "whole mess" by firing the first shots at the car but also stated that he was not arguing that the retaliatory shooting was justified.

¶ 21    The jury found defendant guilty of first degree murder by personally discharging a firearm that proximately caused death to another persona and guilty of aggravated battery.

¶ 22                                C. Posttrial Proceedings

¶ 23    After trial, defendant indicated that he wanted to proceed *pro se* and claimed that his trial counsel "ineffectively assisted" him. Defendant asserted that trial counsel did not send investigators out for his alibi witnesses. Defendant's trial counsel responded that while defendant mentioned an alibi witness and asked him to speak to that witness, defendant never provided a name or address for the witness. Trial counsel believed that defendant did not have an alibi at all. Defendant also argued that trial counsel did not go through the witness statements and grand jury transcripts with him, which trial counsel also denied, stating that it was "disingenuous to suggest that he's never seen the discovery." Trial counsel further asserted that defendant was not being honest with the court and expressed his desire to withdraw from the case. The trial court noted that it had to make a *Krankel* inquiry, allowed trial counsel to withdraw based on irreconcilable differences, and at defendant's request, appointed the public defender's office to represent defendant.

¶ 24    During the months that followed, defendant's appointed counsel reviewed the case and attempted to contact the witness that defendant advised him about. Appointed counsel filed a motion for new trial, which argued that: (1) the trial court erred in extending the speedy trial term beyond 120 days, and (2) defendant's trial counsel was ineffective for engaging in a jury trial against defendant's wishes, not interviewing defendant's alibi witness, not showing defendant videos of the witness statements and grand jury transcripts, and failing to argue for self-defense in light of the fact that Simmons shot at the car first.

¶ 25    On October 16, 2023, the trial court granted defendant's request to proceed *pro se*; however, the same public defendant was later reappointed to represent defendant.

¶ 26    The hearing on defendant's motion for new trial was held on February 21, 2024, where defendant stated that he did not agree with anything his appointed counsel put in the motion for new trial. The trial court told defendant that he did not have to agree with what was in the motion, and that the attorney decided the legal issues to pursue in a posttrial motion. Defendant stated that he wanted to represent himself, but the trial court did not allow him to do so again but told defendant that he could testify if he wanted to.

¶ 27    Defendant testified that trial counsel had only visited him twice while he was in jail and conducted about 10 video visits via Zoom with him. Defendant stated that trial counsel showed him some papers, a police report and electronically recorded statements from Mack and Washington, however, defendant maintained that he did not see any video statements or grand jury transcripts. Defendant further testified that his family members came to court while he was demanding trial and he told trial counsel about it. One of those family members was his uncle, who defendant stated knew that defendant was in Indiana at the time of the shooting. Defendant also stated that he told trial counsel several times that he wanted to have a bench trial and not a jury trial, but trial counsel responded that the trial judge was "pure State" and that the judge might prolong a bench trial up to a year.

¶ 28    On cross-examination, defendant testified that he never told trial counsel about having an alibi witness, nor did he ever tell trial counsel about not being in Chicago at the time of the shooting. Additionally, defendant stated that he spoke with trial counsel about raising self-defense, but trial counsel said that there was no evidence supporting him acting in self-defense. Defendant testified that trial counsel did not explain to him what self-defense was but insisted on going with a reasonable doubt defense.

¶ 29    The State called defendant's trial counsel as a witness at the hearing. Defendant's trial counsel testified that he had numerous conversations with defendant about having a bench trial, a jury trial, and making a guilty plea. Based on his 30 years of experience and the evidence against defendant, trial counsel recommended a jury trial because trial counsel believed that the evidence against defendant was pretty significant, it was an identification case, and defendant agreed with him. Defendant never expressed to him that he wanted a bench trial. Trial counsel stated that he visited defendant at least 10 times in jail and discussed affirmative defenses with defendant. Trial counsel did not believe that an alibi defense was an option because defendant told him that he was present at the shooting and because Ebonie crashed his alibi early in the case. Defendant told trial counsel that he was the shooter and trial counsel refused to go forward with an alibi defense because he "was not going to suborn to perjury." While defendant mentioned pursuing a self-defense theory at trial, trial counsel told him that alibi and self-defense were inconsistent defenses. Trial counsel also believed that self-defense was not an option because too much time had passed between the two shootings and it was too remote and stale of a situation for defendant to assert self-defense. Trial counsel testified that he explained this to defendant, who was not happy because that was his only out at that point, but he had to accept it because those were the facts of the situation. Based on those affirmative defenses being unavailable and because the State was having trouble locating Mack and Washington, the material witnesses, trial counsel decided to go forward with a reasonable doubt strategy at trial. Further, trial counsel testified that he showed defendant all of the videos, reports, electronically recorded interviews, grand jury transcripts, and discovery to defendant before trial.

¶ 30    The trial court denied defendant's motion for new trial, finding that it did not err in extending the speedy trial term because it granted the State's request with great reluctance, did not grant the entirety of the extended term request and the State had set forth a sufficient basis for the extended term. The court further found that defendant did not establish ineffective assistance of counsel, finding that trial counsel was more credible than defendant, defendant's alibi defense was not viable based on his admission about being present for the shooting, counsel's trial strategy in not pursuing inconsistent alibi and self-defense theories, and further opined that defendant would not have had a successful self-defense claim.

¶ 31    The matter proceeded to sentencing. Defendant's presentence investigative (PSI) report indicated that defendant was born on May 6, 1993, he had a child, and he had an 11th grade education. Defendant was suspended and later expelled from high school: and, he never obtained his GED. Defendant did not experience any physical abuse or neglect as a child although his mother had substance abuse issues and was deceased. Defendant had no family contact or support and had never had regular employment prior to his incarceration. The PSI also detailed defendant's criminal history, which included: a 2015 aggravated unlawful use of a weapon (AUUW) conviction with a corresponding sentence of 42 months imprisonment; a 2015 street gang contact conviction with a corresponding two days' in Cook County Jail (CCJ); a 2013 AUUW conviction with a corresponding three-year prison sentence; a 2013 gambling conviction with two days in CCJ; a 2013 disorderly conduct conviction with eight days of public service; a 2013 reckless conduct conviction with 10 days in CCJ; and a 2012 escape/violating electronic monitoring conviction for which defendant received probation.

¶ 32    In aggravation, the State noted that defendant also had a misdemeanor reckless conduct conviction in 2017 for which he received two days in CCJ, and that the escape conviction sentence was consecutive to one for the manufacture and delivery of cannabis. Moreover, the State indicated that defendant had four other criminal cases pending before the court: possession of a controlled substance- defendant was found in possession of 1.4 grams of heroin when he was arrested for the current case; and three separate public indecency charges against defendant that occurred during his pretrial detention involving exposing himself to female officers. The State further noted that defendant was on parole for AUUW when he shot the victims in the current case. The State also argued that the facts of the current case were very aggravating, in that defendant mistook Moore for Simmons, Moore died while he was running away, and Spearman was also shot. Moore's grandmother read a victim impact statement written by Moore's mother, expressing the family's grief over Moore's death. The State requested that the trial court sentence defendant to an appropriate sentence under the law and more than the minimum in light of the aggravation and the seriousness of defendant's actions.

¶ 33    In mitigation, appointed counsel reiterated several of the facts noted in defendant's PSI regarding his background and stated that defendant did not have the best of childhoods. Defendant himself noted that he was misguided and had bad people around him. In allocution, defendant admitted that he committed the shooting but maintained that he never meant for Moore and Spearman to get hurt that day. Defendant explained that he "only did what [he] felt was right" in response to being shot at by Simmons. Defendant stated that he did not try to shoot the victim, did not come after him and did not know; all he was did was what he thought was right because he knew someone shot at them while they were in the vehicle.

¶ 34    In announcing defendant's sentence, the trial court stated that it considered defendant's PSI, the victim impact statement, arguments in aggravation and mitigation, the statutory factors in aggravation and mitigation, non-statutory factors in aggravation and mitigation, and defendant's allocution statement. The court noted that defendant had a fairly significant and extensive criminal background. The court also indicated that it believed defendant's sentence needed to deter others because senseless violence like this must stop. The court acknowledged that defendant had a child and commented on several things from the PSI including defendant's difficult childhood, his mother's drug addiction, lack of employment and schooling, and his criminal history. The court believed that defendant had contributed very little to our community and stated that defendant was far from a productive member of society. The court found that it was hard pressed to say that defendant had ever been a useful citizen and did not really believe that he would ever become a useful member of society and further that society needed to be protected from defendant who posed significant danger to the community. The trial court subsequently sentenced defendant to 40 years' imprisonment for first degree murder, plus a 25-year firearm enhancement term, consecutive to a 15-year term for aggravated battery, for an aggregate 80-year term of imprisonment.

¶ 35    Defendant filed a motion to reconsider sentence, which was denied. This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37                           A. Extension of Trial Term

¶ 38    Over defense objection, the trial court granted the State's motion to extend the speedy trial term by five days. The extension was granted so that the State could continue to look for an eyewitness, Tarvis Washington, who had identified defendant as the shooter. The State's research had yielded information that he was scheduled for a court appearance in Iowa, which would be an

opportunity for the State to secure him as a witness. The State requested a 60-day extension; however, the trial court granted a limited extension of only five days. Defendant contends that the trial court abused its discretion in granting the State's motion to extend the speedy trial term where there were no reasonable grounds to believe that Washington would be located within the extension period, and he was never located. He argues that his conviction should be reversed.

¶ 39    The United States and Illinois Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art.1, sec. 8. Section 103-5 of the Code of Criminal Procedure of 1963 (Code) provides an additional statutory right to a speedy trial. 725 ILCS 5/103-5 (West 2022). Although section 103-5 implements the constitutional right to a speedy trial, the statutory and constitutional rights are not coextensive. *People v. Phipps*, 238 Ill.2d 54, 65 (2010) (citing *People v. Sandoval*, 236 Ill. 2d 57 (2010)); *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 71. Rather, the statute "operates to prevent the constitutional claim from arising except in cases involving prolonged delay or novel issues." (Internal quotation marks omitted). *Id.* The U.S. Constitution guarantees a right to a speedy trial but does not set forth the number of days that constitute a speedy trial. U.S. Const., amends. VI, XIV.  The Illinois speedy trial statute, codified in the Code of Criminal Procedure (Code), on the other hand, specifies the exact number of days within which a trial must be granted to satisfy the speedy trial requirement. 725 ILCS 5/103-5(a) (West 2022).

¶ 40    However, pursuant to section 103-5(a) of the Code, when a defendant is held in custody, he must be brought to trial within 120 days from the date he was taken into custody. 725 ILCS 5/103-5(a) (West 2022). That section states, in pertinent part:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant *** Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record.

The 120-day term must be one continuous period of incarceration. In computing the 120-day term, separate periods of incarceration may not be combined. If a defendant is taken into custody a second (or subsequent) time for the same offense, the term will begin again at day zero." 725 ILCS 5/103-5(a) (West 2022).

¶ 41    The 120–day speedy trial period begins to run automatically if a defendant remains in custody pending trial. *People v. Wooddell,* 219 Ill.2d 166, 174 (2006). That speedy-trial period may be extended once, by up to 60 days, if the trial court finds "that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." 725 ILCS 5/103(c) (West 2022). The State bears the burden of showing due diligence and the test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure his or her presence before the speedy trial term expired. *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 44. We review the trial court's decision to grant an extension for an abuse of discretion. *Id.*

¶ 42    The record reflects that, starting in July 2021, the State indicated to the trial court that it made numerous attempts to locate and speak with multiple material witnesses in the case, including Mack, Ebonie and Washington. The trial court expressed concern about this case being the oldest on its docket and that it would not grant any continuances unless there was a good reason.

Defendant's first speedy trial demand was made on July 19, 2022, and was set to expire on October 13, 2022. On October 11, 2022, the State requested a 60-day extension of the speedy trial term in order to secure material witnesses Mack, Ebonie and Washington. The State represented that it had made four unsuccessful attempts to serve Washington in Chicago and Westmont; after learning that Washington renewed his state identification card with a Riverdale address, unsuccessful service was attempted there as well as seven other unsuccessful attempts to serve him in Chicago. However, the State learned that Washington was recently arrested in Iowa and had an upcoming court date.

¶ 43    However, over defendant's objection, the trial court extended the speedy trial term with respect to Washington for five days beyond the expiration of the speedy trial term. The trial court found that the State used reasonable efforts to try and locate its witnesses, and that it believed that the State should be able locate Washington with the new information it had recently learned. The trial court subsequently continued defendant's trial to one week, October 18, 2022, to determine status and progress on serving Washington. Ultimately, Washington was not located and defendant's trial began on November 4, 2022, which was 22 days after expiration of the speedy trial term.

¶ 44    Based on the record, it is abundantly clear that the trial court acted within its discretion in finding due diligence by the State and in granting the extension. To attempt to secure witnesses for trial, the State engaged in extensive efforts for more than a year beginning in July 2021 before defendant made his first speedy trial demand in July 2022, and the State continued in its efforts after the demand was made, specifically more than 10 attempts to serve Washington after defendant's speedy trial demand was made.

¶ 45    Defendant makes no argument concerning Washington's status as a material witness to the case; indeed, Washington had previously identified defendant as the shooter. Nor does defendant challenge the truthfulness of the State's representations regarding the efforts it made to secure Washington. Rather, defendant contends that the trial court abused its discretion in granting the State's motion to extend the speedy trial term where there were no reasonable grounds to believe that Washington would be located within the extension period, and he was never located. Defendant points to Washington's noncooperation with the State, that he no longer resided in the Chicago area, and that he appeared to purposely dodge the State's attempts to locate him. Defendant further argues that there was "no indication" that the State made any efforts to contact Washington before April 2022, however, that contention is contradicted by the record as noted above.

¶ 46    Defendant's contentions seem to rest on the fact that the State was ultimately unsuccessful in locating Washington. Defendant's claim lacks merit as the record reflects that the State made numerous attempts to secure Washington within the state of Illinois prior to the expiration of defendant's speedy trial term, and that law enforcement in Iowa was also searching for Washington during the very short extension period. Further, the total extension of the speedy trial term amounted to 22 days, which we do not find to be an abuse of discretion as the State was actively searching for Washington, a material witness. Accordingly, the trial court did not abuse its discretion in granting the State's motion for an extension of the speedy trial period.

¶ 47                              B. Ineffective Assistance of Counsel

¶ 48    Next, defendant contends that his trial counsel was ineffective for failing to pursue a theory of second degree murder where there was some evidence to support the claim that he had an

unreasonable belief in the need for self-defense after Simmons shot at him. He argues that it was undisputed at trial that the shooting death of the victim was in direct response to Simmons shooting at the car where defendant and codefendant were riding, trial counsel never considered self-defense as an option, and he was prejudiced as a result. Defendant maintains that trial counsel's reliance on the mistaken belief that if "perfect" self-defense was unavailable, then he could not pursue any lesser mitigated offense, which was a trial strategy based on counsel's misapprehension of the law.

¶ 49     Additionally, defendant contends that posttrial counsel also failed to address this issue of "imperfect" self-defense, instead arguing that trial counsel was ineffective for not raising "perfect" self-defense, which was an "indefensible oversight." He argues that competent counsel would have recognized that a theory of imperfect self-defense could have been pursued, and he was prejudiced by both trial and posttrial counsels' failure to raise this defense and his conviction should be reversed and the cause remanded for a new trial. We note that the report of proceedings from the hearing on defendant's posttrial motion indicate that defendant voiced a difference of opinion with posttrial counsel regarding the revised motion and did not get along with posttrial counsel.

¶ 50     A criminal defendant is guaranteed the right to the effective assistance of counsel by both the United States and Illinois Constitutions. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which our supreme court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88; *People v. Johnson*, 2021 IL 126291, ¶ 52. To establish deficient

performance, a defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel, and the failure to satisfy any one of the prongs preclude a finding of ineffectiveness. *People v. Boose*, 2025 IL App (4th) 231467, ¶ 30; *People v. Peel*, 2018 IL App (4th) 160100, ¶ 40. We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9. On appeal, the standard of review changes, depending on whether the trial court did or did not determine the merits of defendant's *pro se* posttrial claims of ineffective assistance of counsel. *People v. Harris*, 2023 IL App (1st) 210754, ¶ 62. Our supreme court has held that if the trial court made no determination on the merits, then our review is *de novo. Id*. However, if a trial court has reached a determination on the merits of defendant's ineffective assistance of counsel claim, we will reverse only if the trial court's action was manifestly erroneous, meaning that the error was clearly plain, evident, and indisputable. *Id.*

¶ 51       Here, the record reveals that after defendant raised *pro se* claims of ineffective assistance of counsel, the trial court appointed counsel and held a hearing on defendant's motion for new trial where it addressed the merits of defendant's ineffective assistance claims. Accordingly, we will review the trial court's decision under the manifest error standard.

¶ 52       Our review of the record establishes that one of the issues raised during the hearing was whether trial counsel was ineffective for failing to pursue a self-defense theory along with the reasonable doubt theory. In reviewing defendant's claims on appeal, it appears that he is splitting hairs on whether posttrial counsel argued that trial counsel was ineffective for failing to pursue

"imperfect" self-defense rather than perfect self-defense. In any case, we find that defendant has failed to establish that the trial court's determination that trial counsel did not render ineffective assistance of counsel was manifestly erroneous.

¶ 53    A review of the report of proceedings from the motion for new trial hearing established that trial counsel and defendant both testified at the hearing. Trial counsel stated on record his reasons for not pursuing a self-defense theory; essentially, trial counsel indicated that under the circumstances of the case and based on the information gleaned from defendant as well as through discovery, he considered and discarded several theories of defense, including self-defense. Trial counsel testified that defendant told him that he was present at the scene of the shooting, which was contrary to the statement defendant provided to police, and indicated that he did not pursue an alibi defense because he did not want to knowingly make an argument involving perjury. Trial counsel also testified that he discarded self-defense as a theory because the lapse in time between when defendant claimed that he was shot at in the car and the car circling three times before defendant shot the victims was too remote to raise self-defense. Instead, trial counsel decided to proceed on a theory of reasonable doubt as the best option. Counsel further indicated that he would never have presented "inherently inconsistent" defenses such as self-defense and reasonable doubt. He acknowledged that defendant was unhappy with that decision but ultimately accepted it.

¶ 54    Posttrial counsel argued, however, that trial counsel was ineffective for not arguing two theories at trial when the "evidence flows that way" and it was ineffective to not at least mention self-defense when the evidence showed that the first shots were fired by a person who was standing on the street.

¶ 55    At the conclusion of the hearing, the trial court agreed with defendant that while it was possible to pursue inconsistent theories, it was not advisable and that defense counsel, who had over 30 years' experience as a defense attorney, exercised trial strategy in not pursuing inconsistent theories. The trial court further indicated that trial counsel did not have to pursue a self-defense claim and further found that it did not really think that "there was a successful self-defense claim here." The trial court concluded that the way trial counsel approached the case was not ineffective.

¶ 56    After reviewing the full transcript of the hearing, we find that defendant has failed to establish that the trial court's determination that trial counsel did not render ineffective assistance was manifestly erroneous. Conduct that would otherwise constitute first degree murder instead constitutes second degree murder when either of the two statutory mitigating circumstances are present. 720 ILCS 5/9-2(a) (West 2024). The mitigating circumstance at issue here is what is commonly referred to as "imperfect self-defense." *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995); *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 18. A conviction for second degree murder based on the mitigating factor of imperfect self-defense is appropriate when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable . *Jeffries*, 164 Ill. 2d at 113. A defendant is entitled to an instruction on second degree murder if there is some evidence in the record to support his claim that a mitigating circumstance is present. *People v. McDonald*, 2016 IL 118882, ¶ 25.

¶ 57    We agree with the trial court that there was no meritorious self-defense claim supported by the facts of the case as the evidence did not support trial counsel's deficient performance or prejudice to defendant. To establish this affirmative defense, the defendant must present evidence supporting the elements of self-defense: (1) unlawful force was threatened against a person; (2)

the person threatened was not the aggressor; (3) there was an imminent danger of harm; (4) the use of force was necessary: (5) the person actually and subjectively believed a danger existed requiring the use of the force applied; and (6) the person's belief was objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 58    While some evidence presented at trial indicated that someone on St. Louis Avenue shot at a car in which defendant was a passenger, the evidence also indicated that the car proceeded to the end of the block before turning around, driving the wrong way back down the alley. They came back three times before defendant shot at a group of people who were running away, striking both victims in the back. Neither of the victims was the person that defendant claimed shot at the car. It is clear that defendant's retaliatory shooting was not contemporaneous to the initial shooting; rather there was some passage of time as the car made it to the end of the block before turning around and going back three times before defendant began shooting. The evidence does not support any indication that there was an immediate threat at the time the shooting occurred. Any perceived danger had passed well before defendant shot the victims as defendant and the occupants of the car could have kept driving and left the area. At the time defendant shot the victims, he was the aggressor. We conclude that there was insufficient evidence presented to warrant a second degree murder instruction. Accordingly, trial counsel did not render ineffective assistance when he opted not to request a second degree murder instruction, and the trial court's decision was not manifestly erroneous.

¶ 59    It follows then that posttrial counsel was not ineffective for failing to raise the claim that trial counsel was ineffective for not raising an imperfect self-defense claim as it would not have been meritorious as demonstrated above. Defendant therefore cannot establish prejudice. *People*

*v. Givens*, 237 Ill. 2d 311, 331 (if a claim can be disposed of based on an insufficient showing of prejudice, a reviewing court need not consider whether counsel's performance was deficient).

¶ 60                                   C. Excessive Sentence

¶ 61     As an alternate argument, defendant contends that this court should reduce his sentence or remand for a new sentencing hearing where the trial court failed to consider, as a mitigating factor, that there were substantial grounds tending to excuse or justify defendant's criminal conduct, though failing to establish a defense. Specifically, he contends that his 65-year sentence, 20 years over the minimum sentence, would not have been imposed if the trial court had properly considered defendant's belief that he had to respond to the shooting.

¶ 62     Defendant acknowledges that this argument was not properly preserved in the trial court but contends that this court should apply plain error or find ineffective assistance of counsel for failure to properly preserve this issue for review. Defendant argues that his 65-year sentence, without the consideration of a "clearly applicable statutory mitigation factor," violated his right to a fair sentencing hearing and constituted plain error.   The plain error doctrine allows for review of errors so serious to have affected the fairness of the trial and challenged the integrity of the judicial process. As an additional alternate argument, defendant claims that his posttrial counsel was ineffective for failing to specifically raise the issue in the motion to reconsider sentence.

¶ 63     We agree with defendant that this issue is forfeited as it is well settled that to preserve a claim of sentencing error, both a contemporaneous objection and a written post-sentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Consequently, we may review this claim of error only if defendant has established plain error. *Id*.; Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error doctrine is a narrow and limited exception. *Hillier*, 237 Ill. 2d

at 545. In the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id*. Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion. *Id.* If the defendant fails to meet his burden, the procedural default will be honored. *Id.*

¶ 64 The first step in the plain error analysis is to determine whether a clear or obvious error occurred. *People v. Johnson*, 2024 IL 130191, ¶ 44. Defendant contends that the trial court erred by failing to consider as a mitigating factor that there were substantial grounds tending to excuse or justify defendant's criminal conduct, though failing to establish a defense. He urges review of this claim under the second prong of the plain-error doctrine.

¶ 65 The Illinois Constitution requires the trial court to sentence a defendant according to the seriousness of his offense and with the goal of returning him to useful citizenship (Ill. Const. 1970, art. 1, § 11) or, stated otherwise, to consider his rehabilitative potential. *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 39. Our legislature prescribes the acceptable sentencing ranges for criminal offenses, and the court imposes a sentence within the prescribed range. *Id.* In determining the appropriate sentence, the trial court has broad discretion and we will not reverse a sentence absent an abuse of that discretion. *Id.* The trial court is granted such deference in sentencing because it had the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *Id.* ¶ 40. We presume a trial court evaluates the relevant factors in mitigation before it and that presumption cannot be overcome without affirmative evidence of the sentencing court's failure to do so. *Id.* The trial court is not required to set forth every reason or specify the weight it gave to each factor

when determining the sentence. *Id.* When the trial court sentences the defendant within the statutory range, the sentence is presumed proper. *Id.* Such a sentence may be considered excessive and the result of an abuse of discretion if it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.*

¶ 66    In this case, the statutory range for defendant's sentence for first degree murder was 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2024). In addition, a mandatory sentence enhancement of 25-years-to-natural-life imprisonment attached to his sentence because the jury found that defendant personally discharged the firearm that proximately caused the victim's death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2024). Here, as noted above, defendant was convicted and sentenced to 65 years (40 years plus a 25-year firearm enhancement) for first degree murder with the personal discharge of a firearm, and  consecutive 15 years for aggravated battery.  It is the 65-year sentence that defendant takes issue with, maintaining that this sentence, which is 20 years greater than the minimum, does not reflect that defendant believed he acted in self-defense.

¶ 67    At the sentencing hearing on February 21, 2024, following the hearing on defendant's motion for new trial, the record reveals that the trial court considered numerous factors in aggravation and mitigation, as well as a victim impact statement. In aggravation, the State noted that defendant had four other pending cases before the court: possession of a controlled substance, and  three instances of public indecency. Further, defendant was on parole for unlawful use of a weapon (UUW) at the time of the murder, had a prior conviction for aggravated UUW for which he was sentenced to three years' imprisonment in 2013, and had three additional prior felonies.

¶ 68     In mitigation, defendant's posttrial counsel argued that he was 30 years old, had an 11th grade education, was unemployed at the time of the shooting, and did not have the best of childhoods as his mother was a substance abuser. Counsel argued that defendant had been working toward his GED while in custody, completed the Second Chance program, and was trying to turn his life around despite picking up the three new indecency cases while incarcerated pending this trial. Counsel noted that, even at the minimum sentence, defendant would not be released from prison before he was 75 years old and asked for the minimum sentence on that basis.

¶ 69     Defendant made a statement of allocution in which he apologized to the family, stated that he "never meant for no one to shoot as us, me and my friends," and that he only did what he felt was right. Defendant further stated that he never meant for either of the victims to be hurt but only did what he thought was right because someone had shot at them while they were in the vehicle.

¶ 70     The trial court noted the evidence in aggravation and mitigation according to the statutory mitigation factors as well as the information contained in defendant's pre-sentence report and found that defendant had contributed very little to the community and was far from a productive member of society. Further, the court noted that while it was mindful that the law made it paramount to consider how the defendant could be restored to useful citizenship, the court was nevertheless hard pressed to say that defendant had ever been a useful citizen or that defendant would ever become a useful member of society. The trial court concluded that society needed to be protected from defendant and that defendant was a significant danger to the community.

¶ 71    Defendant contends that the trial court erred by failing to consider the statutory mitigating factor that there were substantial grounds tending to excuse or justify his criminal conduct, though failing to establish a defense, as found in 730 ILCS 5/5-5-3.1(a)(4) (West 2024). However, defendant's criminal conduct in this case was based on his possession of a firearm, used to kill and injure innocent bystanders, while on parole for aggravated UUW and other prior felony convictions. Regardless of the fact that "someone" shot at him while he was a passenger in a car driving down St. Louis Avenue, defendant was armed with a firearm while on parole and doubled back down the street three times before shooting the innocent victims in the back as they ran away from him. There was no error by the trial court in not considering the proffered mitigation factor when the evidence as presented at trial did not support such factor. Defendant's sentence was well within the statutory range for his conviction; it was neither the minimum nor the maximum and was not excessive or an abuse of discretion.

¶ 72    Accordingly, we conclude that no error occurred, let alone plain error, and we honor defendant's procedural default. *People v. Bowens*, 407 Ill. App. 3d 1094, 1105 (2011).

¶ 73    It follows then that defendant's claim of ineffective assistance of posttrial counsel for failing to raise this issue must also fail, as he cannot show prejudice. *Givens*, 237 Ill. 2d at 331. We have determined that defendant's sentence was not an abuse of the trial court's discretion and that the trial court did not err in failing to apply a statutory mitigation factor that was unsupported by the evidence presented at trial. Thus, any challenge on that basis by posttrial counsel would have been futile. There can be no ineffective assistance in refraining from performing a futile act. See *People v. Boyd*, 2011 IL App (1st) 182584, ¶ 64. We conclude that posttrial counsel did not render ineffective assistance to defendant.

¶ 74                                  CONCLUSION

¶ 75    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 76    Affirmed.